KRAMER, ET UX. *v.* BOARD OF COUNTY COM-
MISSIONERS FOR PRINCE GEORGE'S
COUNTY, ET AL.

[No. 636, September Term, 1966.]

*Decided November 8, 1967.*

The cause was argued before HAMMOND, C. J., and HOR-
NEY, MARBURY, BARNES and McWILLIAMS, JJ.

*Robert A. Diener,* for appellants.

28

*James J. Lombardi,* with whom were *Lionell M. Lockhart, Harry L. Durity, Joseph S. Casula, Martin Hertz, James F. Sharkey* and *David G. Ross* on the brief, for Board of County Commissioners of Prince George's County, part of appellees.

*James F. Vance* for Helen H. O'Leary, et al., other appellees.

Submitted on brief by *Thomas J. Kenney, United States Attorney, Baltimore, Md.; Edwin L. Weisl, Jr., Assistant Attorney General; Roger P. Marquis, Thomas L. McKevitt* and *Edmund B. Clark, Attorneys, Department of Justice, for the United States,* another appellee.

BARNES, J., delivered the opinion of the Court.

This appeal involves a requested rezoning of 44.9139 acres of land in Prince George's County from the R-R zone (rural residential) to the R-H zone (multiple-family high rise residential—a "floating zone").

The subject property is owned by the appellants and is located east of Livingston Road and the innermost part of Broad Creek off the Potomac River, between Fort Washington Road and Oxon Hill Road. It is located northeast of Harmony Hall and west of Indian Head Highway. It is approximately 1.75 miles from the north shore of the Potomac River and .75 mile from the most northerly part of Broad Creek. It abuts Livingston Road for a distance of 433.85 feet. The ground abutting Livingston Road has an elevation of 24 feet. This level continues eastward for approximately 70 feet and then rises sharply to an elevation of 124 feet where the land is then comparatively flat.

South of the subject property and in the northeast quadrant of the intersection of Fort Washington Road and Livingston Road are 29 single-family dwellings. Immediately to the northwest of the subject property are four dwellings. To the north of the subject property, south of the intersection of Old Fort Road and Livingston Road, are 14 dwellings, the Broad Creek Riding Stables, the Mills Lumber Company, and an electrical sub-station. Both sides of Indian Head Highway from Old Fort

Road to Fort Washington Road are vacant for the most part and wooded with the exception of a gasoline service station in the northwest quadrant of the intersection of Fort Washington Road and Indian Head Highway. To the east of that intersection there is a church and several single-family dwellings; in the southwest quadrant of that intersection there is a hardware store.

On the west side of Livingston Road at Fort Washington Road and south of the intersection is a tavern, and in the northwest quadrant of that intersection there is a building materials, groceries and feed store. Farther north on the west side of Livingston Road is Harmony Hall,[1] built around 1750 by Enoch Magruder. To the west and northwest of the subject property, along the west side of Livingston Road, are seven more single-family dwellings. In general, the areas north of Livingston Road and Old Fort Road and the areas south of Fort Washington are occupied by scattered single-family dwellings.

The subject property and the surrounding area are for the most part zoned R-R. There is a small area of C-2 zoning (more intensive commercial than C-1) in the northwest corner of Indian Head Highway and Fort Washington Road that is presently occupied by a gasoline service station. There is a small area of C-2 zoning along the east side of Livingston Road to the north in the vicinity of Mills Lumber Company, some 2000 feet from the subject property.

The owners of the subject property filed their application on October 30, 1962, to rezone the property from R-R to R-10 (multiple family—high density residential). After the Board of County Commissioners of Prince George's County, sitting as the District Council for that portion of the County lying within the Maryland-Washington District (District Council), passed District Council Resolution No. 325-1962 on November 30, 1962, creating the R-H zone, the owners amended their application to request R-H zoning for the subject property.

---

1. This historical property was called "Harmony Hall" because it was leased for a year in 1792-93 by the two Addison brothers, descendants of Col. John Addison and his son Col. Thomas Addison who built Oxon Hill Manor, for a joint honeymoon for their brides. As a cross word was not spoken during that year, it was agreed that the residence should be called Harmony Hall.

30

The Technical Staff of the Maryland-National Capital Park and Planning Commission originally prepared a Staff Report and submitted it to the Planning Board on July 10, 1963. At that time the application was held without action. An Amended Technical Staff Report was prepared for the meeting of the Planning Board on September 18, 1963, and at the Planning Board's meeting on October 2, 1963, the application was again held without action at the request of the applicants. The applicants, on July 8, 1964, requested that the matter be reconsidered by the Technical Staff. This was done and on August 12, 1964, the Technical Staff filed an Amended Technical Staff Report with the Planning Board. This comprehensive and carefully considered report pointed out that the Master Plan of Land Use for the Henson Creek Watershed, adopted May 15, 1963, and the General Plan for Montgomery and Prince George's Counties, adopted January 22, 1964, both recommended that the subject property and adjoining area would be restricted to single-family use, so that the application was not in accordance with the Master Plan for the area. It was further set forth in the Amended Report that the subject property was located in an area whose character was in fact basically rural and that approval of the application "would permit the instrusion of high density development into this basically single-family development in the area and the existing single-family development." It appeared from the Amended Report that approval of the application "could generate 1760 dwelling units, 4400 people, 176 elementary school pupils, 88 junior high pupils, 88 senior high pupils and 8800 vehicle trips per day." In the opinion of the Technical Staff the approval of the application would have an adverse effect on the historical dwelling, Harmony Hall, and the park area that is proposed to be acquired along the west side of Livingston Road. The Amended Report then quoted part of Section 17A.0 of the ordinance creating the R-H zone, which states the purpose in the creation of that zone, as follows:

"The purpose of the R-H zone is to provide suitable sites for relatively high density residential development at locations recommended in the General Plan or at such other locations as are found to be suitable by

the District Council, and which are selected so as best to accomplish economies in the construction and operation of such public services as transportation, retail shopping facilities, and other community facilities, which depend upon convenient access by residents of the area, and so as to prevent undue congestion in sections of the County where such facilities are not available or cannot be conveniently or economically provided. It is further the purpose to provide on the sites a maximum open space for the benefit of the residents of the development together with a minimum of obstruction to the view of those who live in the surrounding area."

The Amended Report then continued as follows:

"It is the staff's opinion that the request does not satisfy the majority of the criteria set forth in the Ordinance with respect to the establishment of the R-H Zone.

"In summary, the recommendation is based on the following reasons:

"1. The request is not in conformance with the adopted Master Plan for the Henson Creek Watershed, adopted May 15, 1963.

"2. The request is not in conformance with the General Plan for Montgomery and Prince George's Counties, adopted January 22, 1964.

"3. There is no evidence of an error in the original zoning of the subject tract.

"4. There has been an insufficient change in the character of the area to justify the request.

"5. If approved, the request would be spot zoning.

"6. The request does not satisfy the majority of the requirements as set forth in the Ordinance with respect to the purpose of the R-H Zone.

"7. The request is not in keeping with the established character of the area and it would have an adverse effect on the existing single-family development in the area.

"*Recommendaton*: Denial for the R-H Zone."

The Amended Report was submitted to the Planning Board which, at its meeting of October 28, 1964, disapproved the application stating as its reasons all of the reasons given by the Technical Staff except Reason No. 6, *supra*.

At the hearing before the District Council on March 9, 1966, the applicants produced evidence to show what the proposed project would be and that the project was compatible with the surrounding area. Both the urban planning and zoning consultant and the architect who testified for the applicants were well qualified.

Briefly stated, the proposal is for a super block concept, allowing for the development of an area in terms of open land contemplated in the R-H zone. On the highest portion of the subject property there would be a 30-story tower and two adjoining 22-story high-rise apartments in an "S" shape. There would also be six 12-story high-rise apartments at somewhat lower elevations and toward the lower portion of the subject property there would be town houses. Applicant's exhibit 10 (which is in the record, but was not reproduced in the record extract) shows the number of housing units in the tower and high-rise apartments to be 2017 and the number of parking areas (many underground) to be 2522, or parking for 1.25 automobiles per housing unit. The land coverage is limited to 7½ per cent of the subject property.

There was also testimony on behalf of the applicants that the proposal was based upon the suggestions contained in a South Potomac Sector Plan [2] which had been considered by the Technical Staff and which would indicate that the subject property would be located in an area in which the granting of an application for R-H zoning would be appropriate. There is no dispute, however, that the South Potomac Sector Plan has not yet been promulgated by the Technical Staff or the Planning Board and has not been adopted by the District Council. The applicants also produced evidence that there would be adequate water and sewer facilities for the project.

---

2. Although the South Potomac Sector land use plan was introduced into evidence before the District Council as appellant's exhibit 14, it was not included in the record and was, of course, not reproduced in the record extract.

The evidence of those protesting against the granting of the application indicated that the proposal would completely change the character of the single-family residential neighborhood. The proposal would increase the population of the area by 92% and this increase would create a traffic hazard.[3]

---

3. George L. Price, President of the Oxon Hill Vista Citizens Association, testified that he had obtained a letter from the State Roads Commission which brought up to date the traffic figures given by the Technical Staff. He stated: "The letter states the average daily volume in 1964 was 13,100 cars south of Oxon Hill Road and 6,425 cars north of Route 373. 1965 figures have not been made available, but in view of the tremendous growth everywhere in the County, they are surely higher. This is 1966. Current figures must be higher still. The letter also gives the practical capacity of Indian Head Highway, with traffic signal control, as 23,500 vehicles. 8,800 vehicles plus the 1964 figure of 13,100 would come within 1,600 vehicles of the Highway's capacity with traffic lights. I am sure that if we added 8,800 vehicles to 1966 figures—and I note that the applicant admitted that there would be not 8,800 vehicles but in all likelihood 11,200 vehicles—we would reach or exceed the practical capacity given by the State Roads Commission. The approval of this application, from the viewpoint of traffic, could create a completely chaotic situation. * * * I am advised that there were 197 accidents on Indian Head Highway during the first nine months of 1965 between the District Line and Superchief Theatre. Because of traffic conditions people are already detouring a portion of the highway by using Oxon Hill Road. Thus, at peak hours Oxon Hill Road is beginning to fill up. Of course, those using it as a detour still have to go back to Indian Head Highway somewhere. But there are a thousand families in our area who have no choice; they have to use Oxon Hill Road in the course of leaving or coming back to their homes. The addition of 8,800 cars or perhaps 11,200 cars per day to the current traffic volumes, some using Indian Head Highway entirely, and some using Oxon Hill Road in part and Indian Head Highway in part, cannot promote two of the basic reasons for zoning, the safety and welfare of present and future inhabitants. Adding more cars to the volume, and overloading the intersections to the north and south of this property, will not reduce the accident rate, nor decrease the frustration at other intersections farther north. The accident rate is now far too high. * * * We note that the Department of Public Works has no plan to improve Livingston Road. All of the 8,800 or 11,200 vehicle trips likely to be generated will have to pass over Livingston Road in part."

The District Council admitted into evidence a letter from T. Sutton Jett, Regional Director of the United States Department of Interior, in which the Department indicated its support of the action of the Planning Board on October 28, 1964, recommending a denial of the application and stating the reasons for that support. The principal reason was that the increased density would in the Department's opinion, "allow construction adversely affecting the National Park Service proposals in this area as well as the scenic values of the Potomac Valley."

The District Council took the application under advisement and on April 6, 1966, passed a resolution in which it disapproved the application "in accordance with the recommendation of the Park and Planning Commission" and stated:

> "The District Council believes this request should be disapproved based on the Park and Planning Commission's recommendations; and further, on the fact that there is no evidence in the record showing error, or sufficient changes to grant this zoning. It appears that the only evidence in the record is based on a future plan which has not been, and may never be, approved in its present state."

An appeal to the Circuit Court for Prince George's County was duly perfected by the applicants. That court affirmed the action of the District Council and after an appeal was timely taken to this Court, filed an opinion stating the court's reasons for its ruling.

The principal question in the case is whether or not on the record before us the action of the District Council in refusing the application was arbitrary, unreasonable and capricious. The resolution of this determinative question depends on whether the action of the legislative body, in refusing to find that the project was to be erected at a suitable location compatible with the surrounding area, was fairly debatable. We have concluded that it was and we will affirm the order of the lower court.

In our opinion, our decision in *Tauber v. Montgomery County*, 244 Md. 332, 223 A. 2d 615 (1966) is decisive in the case at bar. In *Tauber,* we had before us an application to re-zone 4.825 acres of land in Montgomery County in the north-

east quadrant of the intersection of Massachusetts Avenue and Westbard Avenue in Bethesda from the R-60 (single-family detached and certain institutional and other uses) to the R-H zone (a floating high-rise apartment zone) created by the Montgomery County Council in 1962. The Technical Staff in *Tauber,* however, recommended *approval* of the application, but this recommendation was not accepted by the Montgomery County Planning Board, which recommended denial of the application to the District Council because in the Planning Board's opinion, the application for rezoning was premature and would create "a potentially hazardous and undesirable traffic situation." As in the case at bar, there was testimony at the hearing before the District Council of well-qualified experts describing an attractive high-rise apartment project which complied with all of the provisions in regard to the R-H zone for green spaces and set-backs. There was, as in the present case, testimony indicating a dangerous traffic condition which would be aggravated by the proposed construction. The District Council denied the application in *Tauber* on the ground that the applicants had not established to its satisfaction from the evidence "that the development of the subject property in the R-H zone would be compatible with the surrounding area." The Circuit Court for Montgomery County affirmed the action of the Montgomery District Council and on appeal we affirmed the order of the Circuit Court. We stated:

> "Although the Maryland 'original mistake in zoning-change in conditions in the area' rule is not applicable in considering rezoning for an R-H zone as a 'floating zone' in view of our decision in *Beall v. Montgomery County,* 240 Md. 77, 212 A. 2d 751 (1965) and in the recently decided case of *Bujno v. Montgomery County Council,* 243 Md. 110, 220 A. 2d 126 (decided June 8, 1966), it is clear that the District Council must determine on the evidence that the proposed R-H rezoning is compatible with the surrounding area. *Bujno v. Montgomery County Council, supra.* As the evidence made this issue fairly debatable, the courts may not substitute their judgment for that of the Dis-

trict Council upon this issue. See *Board of County Commissioners for Prince George's County v. Farr,* 242 Md. 315, 218 A. 2d 923 (1966)." (244 Md. at 336-37; 223 A. 2d at 618).

In the case at bar, the ordinance of the District Council creating the R-H zone was not offered in evidence, is not in the record and was, of course, not reproduced in the record extract. We have held many times that we do not ordinarily take judicial notice of ordinances.[4] *Walker v. D'Alesandro,* 212 Md. 163, 170-71, 129 A. 2d 148 (1957) and cases cited in that opinion. Inasmuch as counsel for the appellants supplied the Court with a certified copy of the ordinance at the argument, without objection, a portion of the ordinance appears in the Amended Report of the Technical Staff, and both the District Council and the lower court considered the ordinance, we prefer to decide the case on the merits rather than on the technical ground that the ordinance was not offered in evidence and hence does not appear in the record or the record extract. We hope, however, that the bar will take note of the present law in regard to judicial notice of ordinances and will present cases before the District Council and the lower courts with this rule in mind.

Our examination of the Prince George's County ordinance creating the R-H "floating" zone discloses that it is quite similar to the Montgomery County ordinance creating the Montgomery County R-H "floating" zone. See *Beall v. Montgomery County,* 240 Md. 77, 212 A. 2d 751 (1965) for a detailed consideration of the Montgomery County R-H zone ordinance. In stating the purpose for the creation of the Prince George's

---

4. When ordinances are bound in authoritative volumes which are readily available to the courts, it would seem reasonable that judicial notice might well be taken of such ordinances. Perhaps the General Assembly might give consideration to an addition to Code, Article 35, which would provide for judicial notice of charters and ordinances under the circumstances mentioned. In the case at bar, however, the Code of Public Local Laws of Prince George's County (Everstine, 1963) does not contain the ordinance creating the R-H zone in Prince George's County on November 30, 1962, so that this ordinance is not available in this bound and readily accessible volume.

County R-H zone the language "at locations recommended in the General Plan or at such other locations as are found to be suitable by the District Council" has been added, so that, to this extent, the Prince George's County ordinance differs somewhat from the Montgomery County ordinance. The first clause of the quoted language *broadens* the availability by the property owner for R-H use as it is clear that if the R-H zone appears as a recommended location *on the General Plan,* it is then available to the property owner. If, however, the location does not appear in the General Plan (as is the situation in the case at bar), then the other alternative mentioned, i.e., that the location must be found to be suitable by the District Council, applies. This alternative requirement is, in effect, the same as the requirement in the Montgomery County R-H zoning ordinance that there shall be a maximum of coordination between the proposed development and the surrounding uses when the standards and purposes of the R-H regulations are considered.

There was, in our opinion, sufficient evidence on which the District Council could reasonably conclude that the proposed structures were not to be placed at a suitable location and this issue was fairly debatable. Both the Technical Staff and the Planning Board recommended disapproval and there was sufficient evidence of a substantial aggravation of an existing dangerous traffic condition. In *Tauber* we held that these factors were sufficient to make the issue fairly debatable. As we have noted, in *Tauber,* the Technical Staff had recommended approval, but this recommendation was rejected by the Planning Board, while in the case at bar, both the Technical Staff and the Planning Board recommended disapproval. In short, *Tauber* was a stronger case in favor of the applicants on this issue than is the present case before us. We have recently held that an adverse report by a planning commission alone may be sufficient to make the issue before the legislative body fairly debatable. *Board of County Commissioners of Howard County v. Turf Valley Associates,* 247 Md. 556, 233 A. 2d 753 (1967).

The applicants argue that both the Technical Staff and the Planning Board erroneously considered "error in original zoning" and "change in the character of the area" and that these considerations are not revelant when a floating zone is under

consideration. We have held that the *absence* of error in original zoning or change in the character of the area *is not determinative* of the power to rezone to a floating zone, but this holding does not mean that either of these elements of the "change-mistake" rule may not be relevant to a determination of whether or not the proposal is suitable and compatible with the surrounding area. It can easily be envisioned that by substantial changes in an area since the original comprehensive zoning, a floating zone might well be compatible with the surrounding area and suitable at the proposed location, when this might not have been the case had the original zoning remained unchanged. It was, therefore, relevant *to consider these factors* even though their absence would not necessarily result in a bar to the approval of the application if the District Council found that the location was suitable.

The important thing in this case was that both the Technical Staff and the Planning Board found that the requested rezoning was "not in keeping with the established character of the neighborhood and it would have an adverse effect on the existing single-family development in the area."

In view of our opinion on the principal issue, we do not find it necessary to consider the other issues presented by the appellants.

*Order affirmed, the costs to be paid by the appellants.*