O. C. TAXPAYERS FOR EQUAL RIGHTS, INC. ET AL. *v.* MAYOR AND CITY COUNCIL OF OCEAN CITY ET AL.

[No. 111, September Term, 1976.]

*Decided July 6, 1977.*

*Motion for reconsideration filed July 13, 1977; denied July 13, 1977.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*K. King Burnett* and *Paul D. Wilber*, with whom were *Webb, Burnett & Simpson* on the brief, for appellants.

*Dale R. Cathell* for appellees.

ELDRIDGE, J., delivered the opinion of the Court.

This case concerns the validity of charter amendments adopted by the Mayor and City Council of Ocean City, Maryland, which changed the qualifications for voters in the city elections.

When Ocean City was incorporated by Chapter 209 of the Acts of 1880, the voting franchise was extended not only to residents of the town, but also to certain non-residents owning an interest in Ocean City real estate. This franchise remained substantially unchanged through the next 95 years. Immediately prior to the adoption of the charter amendments at issue in this case, non-residents owning property with an assessed value of at least $1,000 were qualified to vote in the city elections according to Section C-403 of the Ocean City Charter. Under the same section, all adult residents, regardless of property ownership, were entitled to vote.

On January 5, 1976, the Mayor and City Council of Ocean City adopted 48 charter amendment resolutions. Two of these resolutions, 1976-3 and 1976-4, purported to change the qualifications of voters. A Charter Revision Committee originally proposed Resolution 1976-3 to the City Council as a sole and separate amendment to the charter. The effect of 1976-3 was to limit the right to vote to persons who are domiciliaries for the 4 months preceding an election. Non-resident property owners, therefore, could no longer remain on the voter rolls. In addition, 1976-3 stated that non-resident city councilmen could serve out their terms of office even if they were no longer registered voters. Resolution 1976-4, on the other hand, was added by the City Council to the Charter Revision Committee's proposal. This resolution was a so-called "grandfather clause," stating that those non-resident property owners already on the voter rolls as of the date the resolutions were adopted would not be removed from the rolls, solely because of the provisions of 1976-3.

On January 30, 1976, the plaintiffs, non-residents each of

whom owned more than $1,000 worth of property in Ocean City, and approximately 210 other non-residents, registered to vote. Soon after, on February 25, 1976, the voting rolls were examined by the Board of Election Supervisors and all those who had become unqualified to vote — by change of residence, failure to vote in two consecutive elections, death, failure to meet the new residency requirements, etc. — were stricken from the rolls. This affected the 220 non-residents who registered on January 30, 1976, along with some 1,500 others. The plaintiffs requested that the Mayor and City Council reinstate them to the voter rolls, but this request was refused.

Thereupon, on July 23, 1976, the plaintiffs commenced the present action by filing a petition for declaratory relief in the Circuit Court for Worcester County. Plaintiffs there argued, *inter alia*, that resolutions 1976-3 and 1976-4 were void: (1) because their titles did not conform to the requirements of Maryland Code (1957, 1973 Repl. Vol.), Art. 23A, § 13 (c), which requires that every charter amendment adopted by a municipal corporation be limited to a single subject, and further requires that this subject be described in the amendment's title; and (2) because the resolutions created a classification between non-resident property owners registered before January 5, 1976, and all other non-resident property owners which was a denial of equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution.

Immediately after this suit was filed, the Mayor and City Council of Ocean City adopted Charter Resolutions 1976-49, 1976-50 and 1976-51. These resolutions recited the improper titling issue raised by the plaintiffs in their petition for declaratory relief. While the substance of these new resolutions was identical to 1976-3 and 1976-4, they contained new and more descriptive titles. Plaintiffs then filed a motion in the circuit court to amend their petition in order to bring 1976-49, 1976-50 and 1976-51 into issue. This motion was denied, and, after a hearing on the merits, the circuit court held: (1) that the titles and subject matter of 1976-3 and 1976-4 conformed to the requirements of Art.

23A, § 13 (c); (2) that 1976-3, limiting the right to vote to domiciliaries, was valid and constitutional; (3) that the classification between non-resident property owners created by 1976-4 was an arbitrary one and thus violated the Equal Protection Clause of the Fourteenth Amendment; and (4) that 1976-3 and 1976-4 were severable, so that the invalidity of one did not affect the validity of the other. The effect of the circuit court's decision, by sustaining 1976-3 while holding 1976-4 invalid, was to deny the franchise to all non-resident property owners.

Plaintiffs took an appeal to the Court of Special Appeals and, prior to a hearing in that court, petitioned this Court for a writ of certiorari, which we granted. Plaintiffs renew their argument that 1976-3 and 1976-4 are invalid due to improper titling, and argue that 1976-3 and 1976-4 are not severable, so that a holding that 1976-4 is unconstitutional requires that 1976-3 also be declared void.

(1)

Code (1957, 1973 Repl. Vol.), Art. 23A, § 13 (c), requires that "[i]n conformity with a requirement imposed upon the General Assembly . . . every charter amendment adopted by a municipal corporation *shall embrace but one subject, and that shall be described in its title.*" (Emphasis supplied.) The title of charter amendment 1976-3 reads "Resolution of the Mayor and City Council of Ocean City, Maryland, to amend the Town Charter." The title of 1976-4 reads "Resolution of the Mayor and City Council of Ocean City, Maryland, Subsequent to Resolution (Charter) No. 1976-3."

Defendants, arguing that the titles of 1976-3 and 1976-4 adequately describe their subject matter, rely on cases such as *Annapolis v. State*, 30 Md. 112 (1869), which involved an amendment by the General Assembly to the charter of Annapolis. The title of the act read "An Act to amend and alter the Charter of the city at Annapolis." This Court upheld the validity of that title, stating that the "subject matter of legislation, was the charter of a Municipal Corporation," and as such, was adequately described in the

title. *Annapolis v. State, supra,* 30 Md. at 119. Defendants contend that, analogously, the title of resolution 1976-3 is sufficient.

Plaintiffs, on the other hand, argue that what is a sufficient title for an act of the General Assembly is not necessarily sufficient when employed in a municipal corporation's charter amendments. Art. III, § 29 of the Maryland Constitution requires that *"every Law* enacted by the General Assembly shall embrace but one subject, and that shall be described in its title." (Emphasis supplied.) But Art. 23A, § 13 (c), imposes a significantly narrower requirement on municipal corporations. Not all laws, nor all enactments, but rather all *"charter amendment[s]* shall embrace but one subject, and that shall be described in its title." (Emphasis supplied.) Plaintiffs contend that a title such as "Resolution ... to amend the Town Charter" does not even arguably satisfy the requirement that the subject of a charter amendment be described in its title. To approve this title in a municipal charter amendment would be similar to upholding a General Assembly act which simply stated, "An Act to Amend the Laws of Maryland." This type of title, plaintiffs argue, would be clearly insufficient.

Although plaintiffs' argument seems highly persuasive, it is not necessary to decide that issue in this case. We agree with the defendants' argument that even if the titles of 1976-3 and 1976-4 were defective, this defect was cured by the subsequent enactment of 1976-49, 1976-50 and 1976-51.

While a motion by the plaintiffs to amend their petition for declaratory relief so as to include 1976-49, 1976-50 and 1976-51 in the circuit court's proceedings was denied, both plaintiffs and defendants request that we take judicial notice of these later resolutions in our disposition of this case. In the past, this Court has often pointed out the general though not inflexible rule that the courts do not take judicial notice of the enactments of municipal corporations. *Kramer v. Prince George's County,* 248 Md. 27, 36, 234 A. 2d 589 (1967); *Walker v. D'Alesandro,* 212 Md. 163, 170-171, 129 A. 2d 148 (1957), and cases there cited. In 1968, however, the General Assembly enacted what is now Code (1974),

§ 10-203 (a) of the Courts and Judicial Proceedings Article, providing that "[t]he public laws, ordinances, regulations and resolutions approved and enacted by a . . . municipal corporation of the state . . . shall be judicially noticed." Therefore, we take judicial notice of resolutions 1976-49, 1976-50 and 1976-51 (the July resolutions), having content substantially identical to resolutions 1976-3 and 1976-4 (the January resolutions).

The titles of the July resolutions are descriptive of their subject matter [1] and have not been challenged by the plaintiffs. It is well established in Maryland that courts will not ordinarily consider an alleged defect in the title of an earlier enactment when a subsequent valid statute on the same subject cures the alleged title defect in the earlier act. *Grillo v. State,* 209 Md. 154, 120 A. 2d 384 (1954); *Jones v. State,* 207 Md. 481, 115 A. 2d 273 (1955); *Mt. Vernon Co. v. Frankfort Co.,* 111 Md. 561, 75 A. 105 (1909); Everstine, *Titles of Legislative Acts,* 9 Md. L. Rev. 197, 239-240 (1948).

Plaintiffs, however, argue that the July resolutions could not cure the January resolutions since they were not adopted in conformity with Code (1957, 1973 Repl. Vol.), Art. 23A, § 17. Article 23A, § 17 (b) requires that "[t]he resolution to amend a charter shall identify the source of the *existing* section or sections, citing the code or other publication or amendment in which appears the most recent text of the section or sections to be amended." (Emphasis supplied.) Article 23A, § 17 (d) requires, in addition, that the resolution "shall provide specifically (and not simply by implication) for the repeal of any section or sections of the *existing* charter which are inconsistent with the amended

---

1. The title, for example, of 1976-51 reads:

"A RESOLUTION OF THE MAYOR AND CITY COUNCIL OF OCEAN CITY, MARYLAND, to amend the TOWN CHARTER OF OCEAN CITY, MARYLAND to provide a phase out period for existing non-resident registered voters who would otherwise become unqualified to vote in municipal elections solely because of the imposition of mandatory residency requirements enacted in Resolution (Charter) No. 1976-49, by adding a new paragraph (6) to Sub-Section A of Section 175 (Code Section C-403) 'Qualification of Voters'."

section or sections." (Emphasis supplied.) Plaintiffs apparently contend that these requirements were violated when the Mayor and City Council failed to expressly repeal the January resolutions when adopting the July resolutions. As a consequence, the July resolutions purport to repeal language contained in the Ocean City Code, § C-403A (4) as that language already existed before January 1976. That is, plaintiffs contend that the July resolutions attempt to repeal language that had already been repealed by the January resolutions, and that this does not satisfy the statutory requirement that resolutions "identify the source of the *existing* . . . sections, citing the . . . most recent text of the section . . . to be amended." Art. 23A, § 17 (b) (emphasis supplied).

We cannot agree with plaintiffs' conclusion. Plaintiffs' theory of the case is predicated on the invalidity of the January resolutions because of defective titling. It is this theory alone which causes us to consider the July resolutions. However, if the January resolutions were invalid, they were not the "*existing*" provisions for purposes of Art. 23A, §§ 17 (b) and 17 (d). An act which is defectively titled, and therefore invalid under a public general law of the State, clearly need not, for the purposes of Art. 23A, § 17, be treated as the "existing" law. *Cf. Perkins v. Eskridge*, 278 Md. 619, 627-637, 366 A. 2d 21 (1977). In fact, under the plaintiffs' theory of the case, defendants proceeded exactly as they should have in reciting the original text of the code in the July resolutions.

Moreover, even if the enactment of the July resolutions would have involved a technical violation of § 17, we could not agree that, as a consequence, the resolutions should be held invalid. As this Court said in *Mayor of Hagerstown v. Lyon*, 236 Md. 222, 234, 203 A. 2d 260 (1964), with respect to a similar requirement in § 17 (a), "[t]he obvious objectives of Section 17 (a) . . . [are] to permit those who are considering legislation to ascertain, quickly and easily, proposed new legislation or changes in the old." Plaintiffs do not allege, nor is it conceivable under the facts shown by this record, that any member of the City Council or any

interested person was misled by the failure of the July
resolutions to identify or repeal the text of the January
resolutions in the body of the July resolutions. The Mayor
and City Council clearly intended the July resolutions to
cure any formal defects that might be found to exist in the
January resolutions as a result of the plaintiffs' pending
suit. This fact is recited in the preamble of each of the July
resolutions. It is clear that it was so understood at the City
Council meeting where the July resolutions were considered.
We find these circumstances to be substantially similar to
those in *Mayor of Hagerstown v. Lyon, supra,* 236 Md. at
234, where the Court stated:

> "To hold under the circumstances presented here —
> where no fraud or trickery has been attempted or
> perpetrated, and no one has been misled — that the
> failure to comply literally with Section 17 (a)
> invalidated the resolution would, we think, place a
> premium on form and require a disregard of
> substance."

Consequently, the July resolutions are not invalid under
Art. 23A, § 17, and they supersede the January resolutions.
Therefore, any defects which may have existed in the
January resolutions are immaterial under the circumstances
of this case.

(2)

Before considering plaintiffs' arguments regarding
severability, it is necessary for us to consider the premise
which gives rise to that issue, namely the circuit court's
holding that 1976-4 (and, consequently, its successor
1976-51) is invalid under the Fourteenth Amendment's
Equal Protection Clause.

Resolution 1976-51 acts as an exception to 1976-49. While
1976-49 limits the franchise to domiciliaries, 1976-51
provides that currently enrolled non-resident property
owners retain the franchise, despite the provisions of
1976-49. Obviously, 1976-51 effects a classification between
non-resident property owners on the voting lists as of a

certain date and those who seek to be enrolled on the lists after this date.[2]

The stated purpose of this classification is to provide a "phase-out period" for currently registered non-resident voters who would otherwise become disqualified by reason of 1976-49. Presumably, as non-resident voters die, sell their property, or otherwise become disqualified, their names will be removed from the voters' rolls. By this means, it is asserted, non-resident voters will ultimately be "phased out," leaving only domiciliaries on the rolls.

We think, however, the term "phase-out" to be inaccurate. No definite plan calling for a gradual withdrawal of non-resident voters is present. Under the provisions of 1976-51, Ocean City has no control over the continued presence of non-resident voters on the rolls. If non-resident voters, by choice or negligence, disqualify themselves, apparently they cannot be returned to the rolls, but absent this, their franchise is lifetime. In effect, then, under 1976-51, Ocean City has instituted a "freeze," not a "phase-out," limiting the non-residents eligible to vote to those currently enrolled. That is, the privilege to vote is granted to those non-residents currently enrolled and to no others.

It is not, however, within the power of a legislative body to make a statutory classification which confers upon one class privileges which are denied to another class, unless the classification, at minimum, has some rational basis. Moreover, we are, of course, here dealing with the right to vote, and thus the classification is subject to some degree of special scrutiny. *Kramer v. Union Free School District*, 395 U. S. 621, 89 S. Ct. 1886, 23 L.Ed.2d 583 (1969); *Harper v.*

---

2. In addition to this classification, the circuit court also considered those provisions of the Ocean City Charter which required non-residents to be owners of $1,000 worth of property in order to be eligible to vote. The circuit court held this provision as well to be violative of the Equal Protection Clause. It does not appear, however, that any of the plaintiffs were owners of Ocean City property valued at less than $1,000. Indeed, it is not even clear that there are any members at all in the class of non-resident owners of Ocean City real property valued at less than $1,000. Therefore, the issue was not properly before the trial court.

*Virginia Board of Education,* 383 U. S. 663, 86 S. Ct. 1079, 16 L.Ed.2d 169 (1966).

The attempt by Ocean City to grant the voting franchise only to currently registered non-resident voters is a "grandfather clause." Such clauses have the effect of continuing a benefit upon those already receiving it while denying the benefit, or imposing additional burdens, upon the remainder of the class. This type of clause is often, and properly, used when occupations come for the first time under state regulation. For example, in *Watson v. State,* 218 U. S. 173, 30 S. Ct. 644, 54 L. Ed. 987 (1910), affirming this Court's decision in 105 Md. 650, 66 A. 635 (1907), a Maryland statute was upheld which provided for the licensure and qualification of physicians, even though a grandfather clause in the statute exempted physicians who had been in practice as of a certain date from meeting these qualifications. The rationale for this decision is clear. Speaking of these types of exceptions in general, the Supreme Court stated that the exceptions proceed "upon the theory that those who have acceptably followed the profession in the community for a period of years may be assumed to have the qualifications which others are required to manifest as a result of an examination before a board of medical experts." 218 U. S. at 177. Since experience is deemed an adequate substitute for other manifestations of qualification, the purpose of the statute, the general regulation of the medical profession, is furthered. Typically, then, a grandfather clause is justified by some rationale other than merely conferring a benefit on some to the exclusion of others. *See City of New Orleans v. Dukes,* 427 U. S. 297, 303-306, 96 S. Ct. 2513, 2516-2518, 49 L.Ed.2d 511 (1976), for a recent case finding a rational basis for a grandfather clause.

In the present case, however, no justification at all is present, or even suggested, for the freezing of the voter rolls, either on the face of the resolution or in the minutes of the meetings discussing the resolution, other than to confer upon a certain group of people a benefit which, but for the classification, they would not enjoy. Freezing the

non-resident voters eligible to vote does not further the purpose of the statutory scheme to make residency a mandatory requirement for voting in local elections.

There is, therefore, even less reason to sustain this classification than in many of the classifications regarding voting qualifications which have been stricken by the courts. For example, in *Kramer v. Union Free School District, supra,* the state attempted to restrict the vote in school district elections to owners and lessees of real property and parents of school children, on the theory that the state had an interest in limiting the franchise to those "primarily interested" in the elections, *i.e.,* those paying the property taxes which financed the school system as well as the parents of the school children. However, the Supreme Court struck down this classification because the exclusion of otherwise qualified voters was not shown to be necessary to promote a compelling state interest. In the instant case, however, there is not even an arguable public interest that is being served, let alone a compelling one. The classification has no rational relationship to the purposes sought to be accomplished by 1976-49, nor to any other legitimate purpose of which we are aware. Its sole function is to arbitrarily confer a benefit upon certain persons based upon their date of registration. Consequently, the attempt by Ocean City to grant the voting franchise to currently registered non-resident voters, while denying it to other non-resident property owners, violates the Equal Protection Clause of the Fourteenth Amendment.

(3)

Resolution 1976-51 being invalid, we must determine what effect, if any, the invalidity has on 1976-49. If the resolutions are severable, then 1976-49, being in itself a valid enactment, will be allowed to take effect. The result of this would be, as held by the circuit court, that the right to vote in Ocean City elections would be limited to residents; that is, all non-resident property owners, including those currently on the voting rolls, would be disenfranchised. If, on the other

hand, the two resolutions are not severable, then the legislative scheme embodied in 1976-49 and 1976-51 must be invalidated.

Defendants argue that 1976-49 and 51 (originally 1976-3 and 4) were separate and independent statutes and, consequently, that the issue of severability does not arise. In effect, they assert that the provisions are already "severed," being placed in separate legislative acts, and that the invalidity of one should have no effect on the other.

This argument, however, mistakes the nature of the problem. The issue of severability arises when a portion of a unified legislative scheme has been found invalid. This partial invalidity subjects the entire scheme to scrutiny. A determination must always be made as to whether this partial invalidity so affects the legislative scheme that it must fall as a whole, or whether its otherwise valid provisions may be separately enforced. It is, of course, customary to find such legislative schemes within the confines of a single legislative enactment. This is, however, by no means obligatory. A legislature may, if it so chooses, embody a single scheme, dealing with a single subject, in associated bills or acts. But this device should obviously not be controlling in determining whether a partial invalidity causes the invalidity of the whole. *See, e.g., Gay v. Laurens County*, 213 Ga. 518, 100 S.E.2d 271 (1957). As is stated in J. Sutherland, *Statutes and Statutory Construction* § 44.02 (4th ed. C. Sands 1972, Supp. 1976),

> "In fact, the conception of legislation being validated and promulgated in separate, self-contained statutory units called acts, corresponding to independent bills during the enactment process, did not always figure as prominently through the historical past as it does nowadays. Except as constitutional provisions prohibit bills from dealing with more than one subject per bill, there is nothing about the nature of the legislative process which compels either that each separate rule of enacted law be issued in a

separate act or that every separate act embrace all of the interdependent and inseparable legislative treatment of a single subject. In actual legislative practice, it is not uncommon for a legislative program, involving related and interacting provisions, to be embodied in a group of associated bills. This may be done for a variety of reasons, such as to facilitate referral of different portions of the program to different legislative committees during the enacting process or to simplify the incorporation of different portions of the legislation into different sectors of a compilation after their enactment, none of which reasons has anything directly to do with the considerations which govern decision on questions of separability. It is possible, therefore, for separate acts to be legally inseparable."

In the instant case, 1976-3 (1976-49 in the July resolutions) originally contained the provisions limiting the vote to domiciliaries as well as other provisions which were later enacted as 1976-50. Resolution 1976-4, which excepted currently enrolled voters from the domiciliary requirement, while a separate enactment, was the only one of 48 resolutions passed at that session to refer to another resolution in its title: "Resolution No. 1976-4 Resolution of the Mayor and City Council of Ocean City, Maryland, Subsequent to Resolution (Charter) No. 1976-3." Resolution 1976-4 also refers to 1976-3 twice in the body of the resolution.

In addition to this relationship, the resolutions are connected in substance. Both treat the same subject, voter qualifications for Ocean City elections, with 1976-4 acting as an exception to the domiciliary requirement of 1976-3. In fact, the provisions of 1976-4 are wholly unintelligible without reference to the provisions of 1976-3; the two resolutions must be read together in order to determine those persons eligible to vote in Ocean City elections.

Finally, the legislative history of the resolutions provides a clear indication that the Mayor and City Council

understood them to constitute a unified legislative scheme. Resolution 1976-4 was developed by the City Council in direct response to the Charter Revision Committee's proposal of 1976-3. In the minutes of the City Council meeting which addressed these resolutions, it is clear that they are understood as a unitary solution to a particular "problem." The resolutions were discussed together and voted upon in immediate succession. The tenor of the comments made by the City Council at this meeting make it indisputably clear that the legislative scheme developed by the Council comprised both resolutions.[3]

Thus, given the form, substance and legislative history of these resolutions, we believe that they are part of a unified legislative scheme, and that the principles of severability are therefore applicable. This applies to both the January and July resolutions. Although the July resolutions are somewhat different in form, 1976-51 not expressly referring to 1976-49 in its title, the reason for this is apparent on the face of the July resolutions. They recite, in the preamble, the title deficiencies alleged in the instant law suit, and go on to state that "the Mayor and City Council of Ocean City, Maryland, while not agreeing as to the existence of any such deficiencies, is desirous of further clarifying and confirming that residency be a mandatory requirement for voter qualification." Since the changes in the July resolutions purport to address only the formal defects of the January resolutions, they do not suggest that the resolutions be considered as other than a unified legislative scheme.

---

**3.** For example, during this meeting, the President of the City Council stated:

"We're discussing the recommendations of the Charter Revision Committee, we're on Item 3 [1976-3] which says, that you have to live within the corporate limits of Ocean City in order to vote. Along with that, we felt as though we should present the Resolution that was passed to us this afternoon [1976-4] and has been worked on the last few days thinking it being a more fair solution to the problem we have before us and also we felt it fair to let the people know here that this is a Resolution that has been presented."

It is, therefore, necessary to consider whether 1976-3 (and its successor, 1976-49) can be separated from the invalid portion of the legislative scheme, or whether the scheme must be struck down in its entirety.

In determining whether or not the valid portions of a statute or statutory scheme are severable from the invalid portions, the courts look to the intent of the legislature. The intent to be ascertained in questions of severability, however, is not the "actual" legislative intent; the actual legislative intent is manifestly to pass the act as written in its entirety. Rather, when severability is the issue, the courts must look to what *would have been the intent* of the legislative body, if it had known that the statute could be only partially effective. *Anne Arundel County v. Moushabek*, 269 Md. 419, 428, 306 A. 2d 517 (1973); *Sanza v. Maryland Board of Censors*, 245 Md. 319, 338, 226 A. 2d 317 (1966), and cases there cited. That is, would a legislative body, at the time of enactment, have intended that the valid portions be separately effective if it had known that the invalid portions were incapable of being carried out. In the determination of this legislative intent, in addition to considering the legislative history of an enactment, courts have applied a number of principles. These principles, like all rules of statutory construction, are not inflexible commands, but merely aids in determining legislative intent.

Perhaps the most important of these principles is the presumption, even in the absence of an express clause or declaration, that a legislative body generally intends its enactments to be severed if possible. Thus it is a settled policy that, upon finding that a statute is invalid in some respect, it "becomes the duty of the court whenever possible to separate the valid from the invalid provisions," *Davidson v. Miller*, 276 Md. 54, 83, 344 A. 2d 422 (1975). *Accord, Shell Oil Co. v. Supervisor*, 276 Md. 36, 48, 343 A. 2d 521 (1975); *Bringe v. Collins*, 274 Md. 338, 351, 335 A. 2d 670 (1975); *Clark's Park v. Hranicka*, 246 Md. 178, 185, 227 A. 2d 726 (1967); *Baltimore City v. Stuyvesant Co.*, 226 Md. 379, 390, 174 A. 2d 153 (1961).

Moreover, the presence of a severability clause in an enactment, while not conclusive, reinforces the presumption that a legislative body would have intended to enact the valid provisions of a statute, notwithstanding the invalidity of certain portions. *Anne Arundel County v. Moushabek, supra,* 269 Md. at 428; *Sanza v. Maryland Board of Censors, supra,* 245 Md. at 338; *Police Comm'r v. Seigal, Etc., Inc.,* 223 Md. 110, 134, 162 A. 2d 727, *cert. denied,* 364 U. S. 909, 81 S. Ct. 273, 5 L.Ed.2d 225 (1960).

When the dominant purpose of an enactment may largely be carried out notwithstanding the statute's partial invalidity, courts will generally hold the valid portions severable and enforce them. *Shell Oil Co. v. Supervisor, supra,* 276 Md. at 49; *Anne Arundel County v. Moushabek, supra,* 269 Md. at 430. On the other hand, when a statute contains both a general provision and an invalid exception, courts have often refused to sever when the severed statute would impose a duty, sanction or substantial hardship on the otherwise excepted class. *State v. Schuller,* 280 Md. 305, 372 A.. 2d 1076 (1977); *Curtis v. Mactier,* 115 Md. 386, 80 A. 1066 (1911); *Nutwell v. Anne Arundel County,* 110 Md. 667, 73 A. 710 (1909); *Storck v. Baltimore City,* 101 Md. 476, 61 A. 330 (1905). However, when the legislature has otherwise indicated what its intent would have been if such an exception were held invalid, the courts have severed. *Utah Power and Light Co. v. Pfost,* 286 U. S. 165, 52 S. Ct. 548, 76 L. Ed. 1038 (1932); *Greene v. State,* 11 Md. App. 106, 273 A. 2d 830 (1971).

Turning to the instant case, the legislative history of these enactments strongly suggests that the City Council intended the provisions generally limiting the vote to domiciliaries to take effect, even if the provision granting the vote to certain non-resident property owners were held invalid.

This legislation originated as the proposal of the Charter Revision Committee. The Charter Revision Committee's recommendation, which would have limited the franchise exclusively to domiciliaries, was adopted in substance by

the Ocean City Council in resolution 1976-3. Resolution 1976-4, however, was prepared only a few days before enactment. The author of 1976-4, in the proceeding concerning the enactment of the resolutions, stated that

"the primary purpose of this particular Charter Amendment [1976-3] was to maintain Home Rule in Ocean City. . . . [T]his was [the] primary objective and not really to take the vote away from anybody. . . . [T]hat would just be a by-product of doing what . . . was in the best interest of the Town. And if that was the only way to do it, I would be with you 100 per cent, I guarantee you. However, this Resolution [1976-4] that President Cropper just referred to, I think enables us to have our cake and eat it too, because we will be able to preserve Home Rule for Ocean City and yet we do not have to take the vote away from anybody who has it at present."

The tenor of these remarks was uncontradicted. Clearly the dominant purpose of the legislation was to limit the vote to domiciliaries of Ocean City. Severing 1976-51 from the remainder of the legislative scheme would leave substantially the same provisions as were originally proposed to the City Council by the Charter Revision Committee. Thus, the dominant purpose of the legislation could be accomplished by giving effect to 1976-49, notwithstanding the invalidity of 1976-51.

A further aspect of the legislative history showing the City Council's intent that the enactments be considered severable is the Council's insertion of express severability language in resolution 1976-51. As we have noted, the presence of a severability clause, while not always deemed controlling, does reinforce the presumption in favor of severability. In the instant case, the surrounding circumstances would appear to give the severability clause in resolution 1976-51 even greater significance. The January resolutions, Nos. 1976-3 and 1976-4, contained no language

indicating an intent that they be treated as severable. After the enactment of the January resolutions, as previously discussed, the instant lawsuit was filed attacking the classification created by the "grandfather clause," resolution 1976-4, on equal protection grounds. This lawsuit prompted the enactment of resolutions 1976-49 and 1976-51 which effected the same amendments to the charter that 1976-3 and 1976-4 attempted. Resolution 1976-51, unlike its predecessor 1976-4, contained the following language:

"BE IT FURTHER RESOLVED that this Charter Amendment shall be deemed a separate and sole amendment and if ruled void for any reason said voidness shall not be deemed to affect any other provision or amendment of the Charter of Ocean City."

The only significant differences between the July resolutions and the January resolutions were the references to the lawsuit, the corrections of the alleged title defects and the severability clause in 1976-51.

It is necessary to conclude that the Ocean City Council inserted the severability language with the issues of the instant lawsuit in mind, aware of the real possibility that the classification created by the "grandfather act" might be held invalid. It seems clear that the City Council expressed, by means of the severability clause, its intent that the possible invalidity of 1976-51 should not affect the validity of 1976-49. We can think of no other reason for the insertion of the clause.

We hold, therefore, that resolution 1976-51 is invalid under the Equal Protection Clause of the Fourteenth Amendment, and that it is severable from resolution 1976-49. Our conclusion is substantially in accord with that of the circuit court. However, since the circuit court's order adjudicated certain matters which, in our view, should not

have been reached, and since the circuit court's order did not deal with resolutions 1976-49 and 1976-51, that order must be vacated and a new order entered.

> *Order of the Circuit Court for Worcester County vacated, and case remanded to that court for entry of judgment in accordance with this opinion.*
> *Petitioners to pay costs.*