501 A.2d 817

## BURNING TREE CLUB, INC.

v.

Stewart BAINUM, Jr. and Barbara Bainum Renschler.

No. 119, Sept. Term, 1984.

Court of Appeals of Maryland.

Dec. 23, 1985.

Benjamin R. Civiletti (J. Phillip Jordan, Leslie A. Vial, James A. Dunbar and Venable, Baetjer & Howard, Baltimore, and David MacDonald, of counsel, Rockville, on brief), for appellant.

Eileen M. Stein, Chevy Chase (Christine L. Owens, Washington, D.C., and Donna Lenhoff and Terisa Chaw, of counsel, Washington, D.C., on brief), for appellees.

Thomas P. Ondeck and George D. Webster and Webster, Chamberlain & Bean, of counsel, Washington, D.C., on brief, for amicus curiae brief of The Nat. Club Ass'n.

Jeffrey F. Liss, Daniel H. Maccoby, Bruce R. Stewart and Wald, Harkrader & Ross and Edward L. Genn, Brown, Genn, Brown & Karp, of counsel and Elizabeth Symonds, of counsel, Washington, D.C., on brief, for amicus curiae brief of The American Civil Liberties Union Fund.

Stephen H. Sachs, Atty. Gen., Baltimore, Diana G. Motz, Linda H. Lamone, Kaye Brooks Bushel, Robert A. Zarnoch, Asst. Attys. Gen., Annapolis, on brief, for amicus curiae brief of State of Maryland and State Dept. of Assessments and Taxation.

Sally B. Gold and Hylton & Gonzales, Baltimore, Marshal Levick and Lynn Hecht Shafran, New York City, and S. Carey Nicholas, Philadelphia, Pa., and Judith I. Avner, of counsel, New York City, all on brief, for amicus curiae brief of The E.R.A. Impact Project.

Risselle Rosenthal Fleisher, Gen. Counsel, Sally L. Swann, Asst. Gen. Counsel, on brief, Baltimore, for amicus curiae brief of State of Maryland Com'n on Human Relations.

Argued before MURPHY, C.J., SMITH, ELDRIDGE, COLE, RODOWSKY, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland (retired) and THEODORE G. BLOOM, Associate Judge of the Court of Special Appeals, Specially Assigned.

MURPHY, C.J., announcing the judgment of the Court, in which SMITH and ORTH, JJ., join.

Article 46 of the Maryland Declaration of Rights, commonly known as the Equal Rights Amendment (E.R.A.), was adopted by the people of Maryland in November of 1972; it provides:

"Equality of rights under the law shall not be abridged or denied because of sex."

The principal question in this case is whether Maryland Code (1957, 1980 Repl.Vol.), Article 81, § 19(e)(4), which conditionally affords preferential tax assessments to private country clubs operated with the primary purpose of serving or benefiting members of a particular sex, violates the E.R.A.

I

The General Assembly enacted § 19(e) of Art. 81 by ch. 399 of the Acts of 1965. A preamble to the statute declared that it was the legislative intention

"that the assessment of lands used for country clubs shall be maintained at levels compatible with the continued use of such property for country clubs and shall not be adversely affected by neighboring uses of a more intensive and different nature."

The preamble further declared that it was

"in the general public interest that such uses should be encouraged in order to provide open spaces and provide recreational facilities and to prevent the forced conversion of such country clubs to more intensive or different uses as a result of economic pressures caused by the assessment of country club land and improvements at a rate or level incompatible with the practical use of such property for country clubs."

Consistent with the declaration of legislative policy, § 19(e) authorized the State Department of Assessments and Taxation (the Department) to enter into agreements with private country clubs whereby in exchange for a ten-year commit-

ment to preserve its open spaces by not selling or developing its land, a portion of the club's real property taxes would be deferred. Under such agreements, property taxes were imposed based on an assessment of the property as undeveloped land, rather than on a "best use" assessment as if the land were developed to the same density as the surrounding area. The statute permits extensions of preferential tax agreements for periods of not less than five years.

The 1965 legislation had not contained any antidiscrimination provisions. At the 1974 session of the General Assembly, House Bill 620 proposed broad antidiscrimination provisions for insertion in subsection (4) of § 19(e). H.B. 620 was amended in the Senate and the House of Delegates concurred in that amendment. Set forth below is the relevant portion of § 19(e)(4)(i) immediately following the enactment of Ch. 870. Language originally enacted in 1965 appears in regular type. The language of H.B. 620 as introduced appears in italics. The language of the amendment to the House version (the Senate Amendment) appears with single and double underscoring.

[T]he fact that the club facilities may be used by persons or groups other than members or their guests does not disqualify a club under this subsection. *In order to qualify under this section, the club shall not practice or allow to be practiced any form of discrimination in granting membership or guest privileges based upon the race, color, creed, sex, or national origin of any person or persons. The determination as to whether or not any club practices discrimination shall be made by the Office of the Attorney General after affording a hearing to the club.* The provisions of this section with respect to discrimination in sex shall not apply to any club whose facilities are operated with the primary purpose, as determined by the Attorney General, to serve or benefit members of a particular sex, nor to the clubs which exclude certain sexes only on certain days and at certain times. *If the Attorney General determines that a pattern of discrimination is evident in any club, he shall negotiate a consent agreement with that club to cease such discrimination. If that club breaches or violates the consent agreement or refuses to enter a consent agreement, then the Attorney General shall issue a cease and desist order to that club.*

▇▇▇▇▇▇▇▇▇
▇▇▇▇

*If the club breaches or violates the terms of the cease and desist order, the tax exemption, tax credit or beneficial assessment shall be withdrawn, until such time that the Attorney General determines that the club is in compliance with this subsection. Further, any club which fails to qualify as a country club, under paragraph (4) of this subsection because the club has engaged in discrimination shall not be liable for unpaid taxes provided for in subparagraph (7) of this subsection. However the club shall be assessed and taxed without regard to this subsection. There shall be a right of appeal as provided by sections 255 and 256 of Article 41 of this Code (Title "Governor-Executive and Administrative Departments," Subtitle "Administrative Procedure Act").*

The portion of the Senate Amendment set forth with single underlining is the "primary purpose" qualification. It is central to a determination of the issues presented in this case.

## II

Burning Tree Club, located in Bethesda, Maryland, has been a private men's golf club since its foundation in 1922. Its bylaws state that the club is organized specifically to promote and encourage the game of golf. Accordingly, the club consists only of an eighteen-hole golf course, a clubhouse and a pro shop. Membership is limited to 250 residents and 250 nonresidents, honorary, clerical and senior members. A person cannot apply for membership but must be proposed by one member and seconded by another. The decisive criteria are the proposed member's dedication to golf and compatibility with the club's members. However, women are not allowed to become members or to enjoy guest privileges. Furthermore, women are not allowed to enter or use the clubhouse. It is only by appointment on specific days in December that a member's wife may obtain limited access to the pro shop to purchase Christmas gifts for her husband.

Burning Tree occupies approximately 225 acres, 200 of which is open space. When founded in 1922, Burning Tree was located in a rural environment. Since that time, the area surrounding the club has become highly developed. In 1965, Burning Tree entered into an agreement with the State, pursuant to § 19(e), whereby it agreed to preserve its open spaces for ten years in return for a property tax deferral. The agreement was extended for ten years in 1975.

In 1978, pursuant to authority vested in him under § 19(e)(4), the Attorney General determined that Burning Tree did not discriminate on the basis of race, color, creed, or national origin, and that the sex discrimination prohibition was not applicable because the club was operated with the primary purpose of serving members of one sex. In 1981, Burning Tree executed a 50-year agreement with the State to preserve its open space in exchange for a tax deferral. Although Burning Tree is only one of many country clubs maintaining open-space agreements with the State, it is the only club that qualifies for the tax preference because of a primary purpose to serve members of one sex. The value of Burning Tree's tax deferral is exemplified by the fact that in 1981 alone the club realized a tax savings of approximately $130,000 as a result of its preferential tax assessment.

### III

By bill of complaint filed in the Circuit Court for Montgomery County on August 12, 1983, Stewart Bainum, as taxpayer, and Barbara Renschler, as taxpayer and as a woman seeking membership in Burning Tree, sued the State, the Department and Burning Tree; they sought,

first, a declaration that the primary purpose provision of § 19(e)(4) violated the E.R.A. and Articles 15[1] and 24[2] of the Maryland Declaration of Rights; second, an order enjoining preferential tax treatment for Burning Tree; and third, an order that Burning Tree entertain women's membership applications.

Acting on cross-motions for summary judgment, the circuit court (Raker, J.) declared the primary purpose provision of § 19(e)(4) to be violative of the E.R.A. and thus null and void. The court enjoined the State and the Department from granting preferential tax benefits to Burning Tree as long as the club discriminated on the basis of sex in granting membership or guest privileges. In so holding, the court noted that the E.R.A. was limited to sex discrimination imposed "under the law" and therefore applied only to state action or to private conduct that could fairly be characterized as involving state action. The court concluded that the statutory scheme contained in § 19(e) was the product of state action and thus subject to constitutional review and restraint. The court observed that the primary purpose provision of § 19(e)(4) specifically authorized the tax preference for country clubs that discriminatorily operated their facilities for the benefit of only one sex. It said that the statutory scheme "provides encouragement, ap-

---

1. Article 15 provides in part that all taxes levied by the State shall be "for the support of the general State Government" and that taxes are to be imposed "with a political view for the good government and benefit of the community." The power of the legislature to grant exemptions from property taxes for a public purpose is well recognized and consistent with the provisions of this article. *State Tax Comm. v. Gales*, 222 Md. 543, 161 A.2d 676 (1960); *Baltimore City v. Starr Church*, 106 Md. 281, 67 A. 261 (1907).

2. Article 24 provides in part that no person "ought ... [to be] deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." This article embodies the concept of equal protection of the law, and we have long recognized that decisions of the Supreme Court interpreting the equal protection clause of the federal constitution are persuasive authority in cases involving the equal treatment provisions of Article 24. *Hornbeck v. Somerset Co. Bd. of Educ.*, 295 Md. 597, 458 A.2d 758 (1983).

proval and financial aid to private [sex] discrimination" and that such discrimination was proscribed by the E.R.A. The court also found that the statute involved the Attorney General in Burning Tree's sex discrimination policy since, under § 19(e)(4), he was required to "enforce" the club's policy of excluding women from membership. While noting that § 19(e)(4) does not facially discriminate against either sex, or impose greater burdens, or provide greater benefits to a particular sex, the court held that the statute violated the E.R.A. because, notwithstanding its facial neutrality, it had a discriminatory effect. It said that the primary purpose provision was analogous to other facially neutral statutes which, when challenged on Fourteenth Amendment grounds, were invalidated by the Supreme Court because they effectively sanctioned racial discrimination by private organizations. The court held that the primary purpose provision of the statute made distinctions based on sex, but not upon race, creed or national origin, and therefore "impermissibly made gender a distinguishing characteristic." The court found that § 19(e)(4) placed state sanctions behind Burning Tree's discriminatory membership rules since, to qualify for the tax benefit, the club had to adhere to its bylaws restricting membership to males. The court said that the primary purpose provision had but one purpose and effect—"to allow country clubs to discriminate on the basis of sex and make sex a factor." Finally, the court expressed the view that in reality the primary purpose provision

"operates to exclude women and to suggest that a dual system supported by State funds is acceptable. Such interpretation would defeat the purpose and spirit of the E.R.A."

In view of its disposition of the E.R.A. claim, the court found it unnecessary to consider whether the primary purpose provision also violated Articles 15 and 24 of the Maryland Declaration of Rights.

The court found no merit in the appellees' claim that women could not constitutionally be excluded from membership in Burning Tree. It noted that the claim was built

upon the premise that (1) as Burning Tree served the state function of providing open spaces, and (2) as it was subsidized in doing so by a grant of preferential tax treatment by the State, and (3) as the State participated in assessing the degree of discrimination practiced by the club in order to qualify for preferential tax treatment, Burning Tree's policy of excluding women from membership and guest privileges constituted state action in violation of the E.R.A. and Article 24 of the Maryland Declaration of Rights. As the court had declared the primary purpose provision to be null and void under the E.R.A., it concluded that the State played no part in establishing, encouraging or sanctioning Burning Tree's sex discrimination policies and consequently no state action violative of the E.R.A. or Article 24 was involved.

Burning Tree appealed from the circuit court's decree. We granted certiorari prior to consideration by the intermediate appellate court to consider the significant issues raised in the case.

## IV

Burning Tree contends that all-male and all-female private country clubs are entirely consistent with public policy and that the neutral availability of preferential tax benefits to all single sex clubs does not constitute invidious sex-based discrimination in violation of the E.R.A. On the contrary, the club maintains that § 19(e)(4) reflects a policy judgment by the legislature respecting the value of single sex country clubs—that while the statute generally prohibits sex discrimination in mixed membership country clubs, the primary purpose provision represents a legislative determination that where a club is operated primarily for the benefit of a particular sex, or excludes one sex on certain days or at certain hours, no unconstitutional sex discrimination is involved. Burning Tree contends that in enacting the primary purpose provision, the legislature intended that rights of privacy and association be accommodated in the

implementation of the State's policy against sex-based discrimination.

The club argues that a statute offends the E.R.A. only when it imposes different benefits or burdens based on sex. Section 19(e)(4) does not distribute benefits or burdens unequally, the club contends, because the tax deferral is available to all single sex country clubs. It points out that the additional burden imposed on state taxpayers by the deferring of part of a club's property taxes is shared by male and female taxpayers alike and that, correspondingly, the benefits bestowed upon the general public by the preservation of open spaces is shared equally by men and women. It is only "equality of rights under the law" which Burning Tree says cannot be denied on account of sex; it maintains that no such right is denied to anyone by the primary purpose provision as the only right deriving from that provision is that of a single sex club, whether of men or women, to obtain a tax deferral. Burning Tree argues that the mere grant of a tax benefit to a country club which enters into an open space agreement with the State does not constitute state encouragement, approval, or financial support of private sex discrimination. Burning Tree's membership policies, the club explains, have remained unchanged since its founding in 1922. Nor it claims does the Attorney General enforce the club's membership policies as he is simply a fact-finder, determining only whether a club is operated primarily for the benefit of members of a particular sex. As to the Supreme Court cases relied upon by the circuit court, the club contends that they are wholly inapposite because they all involved racial discrimination which arose from a history and in a context entirely different that that which gave rise to the E.R.A. and to the primary purpose provision.

## V

That equal rights amendments to state constitutions were prompted by a long history of denial of equal rights for women is well recognized. As the commentators have

indicated, the subordinate status of women in our society has for all too many years been firmly entrenched in our legal system, with women being excluded by law from various rights, obligations or responsibilities. *See* Brown, Emerson, Falk and Freedman, *The Equal Rights Amendment: Constitutional Basis for Equal Rights for Women,* 80 Yale L.J. 871 (1971); Note 9 U.Balt.L.Rev. 342 (1980). The basic principle of equal rights amendments "is that sex is not a permissible factor in determining the legal rights of women, or men . . . [so that] the treatment of any person by the law may not be based upon the circumstance that such person is of one sex or the other." 80 Yale L.J. at 889. Consistent with this basic precept, we noted in *Rand v. Rand,* 280 Md. 508, 374 A.2d 900 (1977) that the Maryland E.R.A., in clear and unequivocal language, mandates that "Equality of rights under the law shall not be abridged or denied because of sex." This constitutional provision, we said, drastically altered traditional views of the validity of sex-based classifications imposed "under the law," and was cogent evidence that the people of Maryland were fully committed to equal rights for men and women. It was in this context that we observed that the E.R.A.'s guarantee of equality of rights under the law "can only mean that sex is not a factor." 280 Md. at 512, 374 A.2d 900.

It is thus clear that the E.R.A. flatly prohibits gender-based classifications, either under legislative enactments, governmental policies, or by application of common law rules, in the allocation of benefits, burdens, rights and responsibilities as between men and women.[3] The E.R.A. does not, of course, proscribe purely private conduct which

---

**3.** Disparate treatment on account of physical characteristics unique to one sex is generally regarded as beyond the reach of equal rights amendments. *See, e.g., Brooks v. State,* 24 Md.App. 334, 330 A.2d 670, *cert. denied,* 275 Md. 746 (1975), holding that it does not violate the E.R.A. to punish only men for rape as principals in the first degree because only men can commit that crime. *See also* 80 Yale L.J., *supra,* at 893–896. And, *see generally* Annot., 90 A.L.R.3d 158 (1979) (Construction and Application of State Equal Rights Amendments Forbidding Determination of Rights Based on Sex).

results in sex discrimination. It may, however, prohibit such discrimination by private individuals or organizations whose activities so involve the government as to implicate the "state action" doctrine so frequently applied in equal protection cases arising under the fourteenth amendment to the federal constitution. *See, e.g., Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Statom v. Bd. of Comm.,* 233 Md. 57, 195 A.2d 41 (1963).[4]

That the E.R.A. is essentially limited in its scope to unequal treatment imposed by law as between the sexes is clear from our cases. In *Md. St. Bd. of Barber Ex. v. Kuhn,* 270 Md. 496, 312 A.2d 216 (1973), we held that a statutory scheme which allowed barbers to cut men's and women's hair, but restricted cosmetologists to cutting women's hair, did not violate cosmetologists' rights under the E.R.A. because the law applied to male and female cosmetologists and, therefore, they were not denied equality of rights based on their sex. In *Rand v. Rand, supra,* 280 Md. at 516, 374 A.2d 900, we held that the common law rule that the father is primarily liable for the support of his minor children was irreconcilable with the E.R.A. We concluded that the "parental obligation for child support is not primarily an obligation of the father but is one shared by both parents." *Id.* Therefore, *Rand* involved a burden, the child support obligation, imposed solely on one sex. Similarly, in *Kline v. Ansell,* 287 Md. 585, 593, 414 A.2d 929 (1980), we held that the common law rule that only men could sue or be sued for criminal conversation violated the E.R.A. because it "provides different benefits for and imposes different burdens upon its citizens based solely upon

---

**4.** The Attorney General of Maryland has also recognized that sex discrimination policies of private organizations not affected with state action are not within the ambit of the E.R.A. *See* 68 Op.Att'y Gen. 164 (1983); 68 Op.Att'y Gen. 173 (1983); 65 Op.Att'y Gen. 103 (1980); 63 Op.Att'y Gen. 246 (1978).

their sex." Again, in *Condore v. Prince George's Co.*, 289 Md. 516, 425 A.2d 1011 (1981), we focused on the burdens placed on one group of citizens solely due to their sex, and held that the common law doctrine of necessaries which obligates the husband, but not the wife, to pay for the spouse's necessaries, violated the E.R.A. In *Turner v. State*, 299 Md. 565, 474 A.2d 1297 (1984), we considered a criminal statute which prohibited the employment by taverns of so-called female sitters to solicit customers to purchase drinks. Noting that this Court "has consistently held that a law that imposes different benefits and different burdens upon persons based solely upon their sex violates the Maryland ERA," *id.* at 574, 474 A.2d 1297, we invalidated the statute because a man could be employed as a sitter but a woman could not. *See also Kerr v. Kerr*, 287 Md. 363, 412 A.2d 1001 (1980), holding that a provision of the Maryland Constitution permitting imprisonment for failure to pay child support is, in equal protection parlance, a neutral provision as it imposes a sanction on women as well as men.

Representative cases of the Court of Special Appeals are in accord. In *Coleman v. State*, 37 Md.App. 322, 377 A.2d 553 (1977), it was held that criminal liability for desertion and nonsupport imposed only on the husband violated the E.R.A. And, in *Bell v. Bell*, 38 Md.App. 10, 379 A.2d 419 (1977), *cert. denied*, 282 Md. 729 (1978), the court held that the common law presumption that the husband is the dominant figure in the marriage was invalid under the E.R.A. In *Tidler v. Tidler*, 50 Md.App. 1, 435 A.2d 489 (1981), the court held that under the E.R.A. men and women alike could be held responsible for counsel fees in divorce actions. In *Stern v. Stern*, 58 Md.App. 280, 473 A.2d 56 (1984), the court held that the duty of child support is a joint duty of both parents under the E.R.A. and extends to the support of a disabled adult child.

Other jurisdictions with equal rights amendments have reached similar results. In *Marchioro v. Chaney*, 90 Wash.2d 298, 582 P.2d 487, 491–92 (1978), *aff'd on other*

*grounds,* 442 U.S. 191, 99 S.Ct. 2243, 60 L.Ed.2d 816 (1979), the Supreme Court of Washington upheld a statutory mandate that two members of the State Democratic Committee elected by the counties be of the opposite sex. The court noted that the thrust of the equal rights amendment is to end special treatment for or discrimination against either sex. *Id.* 582 P.2d at 491.[5] The court reasoned that sexual equality mandated by statute cannot violate the E.R.A. because there is no discrimination or denial of rights. Furthermore, the court concluded, "while there is certainly a classification, there is equality of treatment and this is sufficient to meet the requirements of the equal rights amendment." *Id.* at 492. In *State v. Wood,* 89 Wash.2d 97, 569 P.2d 1148 (1977), the court recognized that the E.R.A. affords no protection "unless it is first demonstrated that either a right or a responsibility has been denied or abridged on account of that person's sex." *Id.* 569 P.2d at 1151. Accordingly, it held that a statutory requirement that a father contribute to the support of his illegitimate child did not deny the father any rights nor create any new responsibility solely on account of his sex because the responsibility of child support remained with both parents. *See also Darrin v. Gould,* 85 Wash.2d 859, 540 P.2d 882 (1975), invalidating under that state's E.R.A. a regulation which forbade qualified high school girls from playing on sports teams with boys.

Similarly, the Supreme Court of Pennsylvania held that a statutory provision allowing payment of alimony to the wife, but not to the husband, violated the E.R.A. It said:

"The thrust of the Equal Rights Amendment is to insure equality of rights under the law and to eliminate sex as a basis for distinction. The sex of citizens of this Commonwealth is no longer a permissible factor in the determination of their legal rights and legal responsibilities. The

---

5. The Washington equal rights amendment, Wash. Const., art. 31, § 1, provides: "Equality of rights and responsibility under the law shall not be denied or abridged on account of sex."

law will not impose different benefits or different burdens upon the members of a society based on the fact that they may be man or woman." *Henderson v. Henderson,* 458 Pa. 97, 327 A.2d 60, 62 (1974).[6]

*See also Hartford Acc. & Indem. v. Insurance Com'r,* 505 Pa. 571, 482 A.2d 542 (1984) indicating that gender-based automobile insurance rates approved by the state were unfairly discriminatory under the Pennsylvania E.R.A.[7]; *Com. v. Stein,* 487 Pa. 1, 406 A.2d 1381 (1979) (holding statutes affording wives but not husbands in rem support remedies to be infirm under the E.R.A.); *Commonwealth v. Butler,* 458 Pa. 289, 328 A.2d 851 (1974) (differential sentencing procedures for men and women violate the E.R.A.).

Under Alaska's equal rights amendment, the court held that to grant men but not women the right to sue for loss of consortium would be unconstitutional. *Schreiner v. Fruit,* 519 P.2d 462, n. 16 (Alas.1974).[8]

Under the Illinois equal rights provision, the Supreme Court of Illinois held that provisions under that state's marriage law which treated males and females differently for the purpose of determining their rights to a marriage license were unconstitutional. *Phelps v. Bing,* 58 Ill.2d 32, 316 N.E.2d 775, 777 (1974).[9] *See also People v. Ellis,* 57 Ill.2d 127, 311 N.E.2d 98 (1974) (different age for juvenile classification of boys than girls violates the E.R.A.).

---

**6.** The Pennsylvania E.R.A. provides that "Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual." Pa. Const., art. I, § 28.

**7.** The Attorney General of Maryland has reached the opposite conclusion. *See* 68 Op.Att'y Gen. 164 (1983).

**8.** "No person is to be denied the enjoyment of any civil or political right because of race, color, creed, sex, or national origin." Alas. Const., art. 1, § 3.

**9.** "The equal protection of the laws shall not be denied or abridged on account of sex by the State or its units of local government and school districts." Ill. Const., art. 1, § 18.

Connecticut's highest court has held that a regulation violated the state's equal rights amendment where it allowed a husband, but not a wife, deductions for dependent children in calculating the amount that must be paid to help support a parent on welfare. *Page v. Welfare Commissioner,* 170 Conn. 258, 365 A.2d 1118, 1124 (1976).[10]

The Supreme Court of Virginia has held that the necessaries doctrine which obligates a husband to pay for his wife's necessaries, but does not similarly obligate the wife, violated that state's equal rights amendment prohibiting "any governmental discrimination upon the basis of ... sex." Va. Const., art. I, § 11. *Schilling v. Bedford Cty. Memorial Hosp.,* 225 Va. 539, 303 S.E.2d 905 (1983).

The Supreme Court of Colorado held in *R. McG. v. J.W.,* 200 Colo. 345, 615 P.2d 666 (1980) that a statute granting a natural mother the right to bring an action for the determination of paternity, but not granting the father the same right, violated the Colorado E.R.A.[11]

In *Com. v. King,* 374 Mass. 5, 372 N.E.2d 196 (1977), the court held that punishment of female but not male prostitutes violates the E.R.A.[12] In *Opinion of the Justices to the House of Rep.,* 374 Mass. 836, 371 N.E.2d 426 (1977), the court advised that a proposed bill prohibiting women from participating in certain contact sports with men would constitute sexual discrimination in violation of that state's E.R.A. *See also Atty. Gen. v. Mass. Interscholastic Athletic,* 378 Mass. 342, 393 N.E.2d 284 (1979) holding that a

---

**10.** "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin or sex." Conn. Const., art. I, § 20.

**11.** "Equality of rights under the law shall not be denied or abridged by the state of Colorado or any of its political subdivisions on account of sex." Colo. Const., art. 2, § 29.

**12.** The Massachusetts E.R.A. provides: "Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin." (Art. 106, Mass. Const.)

regulation that prohibited boys from playing on a girls' team, though girls could play on a boys' team when the sport was not offered for girls, violated the state's E.R.A. *See also Texas Woman's University v. Chayklintaste*, 521 S.W.2d 949 (Tex.Civ.App.1975), *rev'd on other grounds*, 530 S.W.2d 927 (Tex.1975) (on-campus housing for women only violates the E.R.A.); Annot., 90 A.L.R.3d 158 (1979); 16A Am.Jur.2d *Constitutional Law* §§ 574–579 (1979).

## VI

The cases construing equal rights amendments share a common thread; they generally invalidate governmental action which imposes a burden on one sex but not the other, or grants a benefit to one but not the other. The equality between the sexes mandated by the Maryland E.R.A. is of "rights" of individuals "under the law." In this context, the word "rights," according to commentators, "includes all forms of privileges, immunities, benefits and responsibilities of citizens." 80 Yale L.J., *supra*, at 908. As to these, the Maryland E.R.A. absolutely forbids the determination of such "rights," as may be accorded by law, solely on the basis of one's sex, *i.e.*, sex is an impermissible factor in making any such determination. *See Rand v. Rand, supra; Kline v. Ansell, supra; Turner v. State, supra.* Manifestly, however, there must be a denial or abridgement of equal rights under the law as between men and women before the protection afforded by the E.R.A. is triggered. Absent such a denial or abridgement, the provisions of the E.R.A. simply have no application.

At stake in this case is not the right of a private men's country club to maintain a single sex membership policy; that right is conceded. What is challenged as violative of the E.R.A. is the statutory provision granting a governmental tax preference to a private club which discriminates against women solely on the basis of their sex. Of course, action by the State is involved in the enactment of § 19(e)(4), and in its administration by State officials. But

the statute does no more than afford the tax benefit to all eligible private country clubs, whether comprised of all men, all women, or of mixed membership, in return for the club's agreement to preserve its open spaces in the public interest. Recognizing that there may be private country clubs which operate their facilities with the primary purpose of serving or benefiting members of only one sex, the legislature manifestly determined that it was consistent with state policy regarding sex discrimination to contract with such clubs of either sex on an equal basis.[13] That § 19(e)(4) facially achieves that end is clear; it does not apportion or distribute benefits or burdens unequally among the sexes, but rather makes the tax benefit equally available to all single sex country clubs agreeing to participate in the State's open space program. The only burden is that imposed on the public treasury as a result of the preferential tax assessment afforded to qualifying country clubs. This burden is born equally by all Maryland citizens, men and women alike. At the same time, the benefits which accrue from the preservation of open spaces are shared equally by each sex. Under its terms, the primary purpose provision is sex-neutral because it operates without regard to gender. It does not involve unequal treatment as between the sexes in obtaining the right conferred by the statute to obtain a tax deferral.

## VII

We recognize that a statute may be couched in gender neutral terms and still have an unconstitutionally discriminatory purpose and effect. The Supreme Court has so found in a number of cases involving racial discrimination

---

13. The public policy of the State expressly prohibits sex discrimination in matters involving public accommodations, employment, housing and bank financing. *See* Code, Art. 49B, §§ 5, 14, 19 and 22, respectively. Private clubs are expressly excluded from the mandate of § 5.

under the fourteenth amendment.[14] Placing reliance on this principle, the appellees maintain that as the State could not itself require a single sex membership policy in a private country club, neither may it award financial aid in the form of a tax benefit to such an entity under a statutory scheme which, while gender-neutral on its face, unconstitutionally perpetuates sex discrimination in violation of the E.R.A. In this regard, appellees say that it is because of Burning Tree's discriminatory membership policy that it qualifies for the tax benefit under the primary purpose provision of the statute. Consequently, they argue that as the State is responsible for the enactment and implementation of § 19(e)(4), it has encouraged, supported and financially aided Burning Tree in a way which makes its discriminatory policy attributable to the State itself. Appellees emphasize that Burning Tree is the only single sex club in the State to benefit from the tax subsidy; that there are no all-women country clubs within the State; and that women, therefore, do not share equally in the State's largess. Proceeding further, the appellees suggest that under the statutory scheme, Burning Tree must continue to discriminate against women in order to retain its valuable tax benefit. They claim that the statute constitutes a state-established and enforced disincentive to easing discrimination barriers between the sexes since any change in Burning Tree's membership policy would place its preferential tax statute in jeopardy, dictating therefore that it continue to exclude

---

14. *See, e.g., Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (invalidating a racially neutral anti-miscegenation statute on the ground that it unconstitutionally discriminated against blacks); *Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) (invalidating a state constitutional amendment which prohibited the enactment of statutes limiting the right of any person to sell or not sell property to any other person); *Anderson v. Martin,* 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed.2d 430 (1964) (state requirement that a candidate's race be included on the election ballot discriminated against blacks even though the requirement was equally applicable to all races); *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) (governmental enforcement of racially restrictive covenants discriminated against blacks).

women from membership. Appellees rely with particular enthusiasm on *Norwood v. Harrison*, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973), a fourteenth amendment racial discrimination case which they contend holds that a state statute is unconstitutional even if racially neutral in its terms, if it provides aid to private institutions that practice racial or other forms of invidious discrimination.

As earlier observed, the Maryland E.R.A. prohibits only sex discrimination that is imposed "under the law," *i.e.*, by direct government action or by the conduct of a private party or organization whose activities so involve the government that its action can fairly be treated as "state action." The limits of the state action doctrine, as applied in fourteenth amendment litigation, have been well explained in a number of recent Supreme Court cases.

In *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), the Court said that for the state action doctrine to apply the conduct allegedly causing a deprivation of the claimed constitutional right must be fairly attributed to the state. 457 U.S. at 937, 102 S.Ct. at 2753. In the determination of this issue, *Lugar* indicated the application of this two-part test:

"First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Id.*

As to the second part of the test, *Lugar* said that action by a private party pursuant to a statute "without something more" does not justify a characterization of the private party as a state actor. *Id.* at 939, 102 S.Ct. at 2754. Illustrating the application of the two-part test in connection with a private club, the Court referred to its earlier

decision in *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). In that case, a private club dispensing alcoholic beverages, and therefore subject to extensive state regulation, had a racially discriminatory membership policy. The Court first noted that for the state action doctrine to be applicable, the impetus for the forbidden discrimination need not originate with the state "if it is state action that enforces privately originated discrimination." 407 U.S. at 172, 92 S.Ct. at 1971. But the Court said that when the impetus for the discrimination is private, the state must have significantly involved itself with the invidious discrimination before the doctrine may be invoked. Private discrimination has never been held to violate the fourteenth amendment, the Court said, simply because the private organization "receives any sort of benefit or service at all from the State, or if it is subject to state regulation in any degree whatsoever." *Id.* at 173, 92 S.Ct. at 1971. The holding in *Moose Lodge* was that the state, acting through its Liquor Control Board, played no part in establishing or enforcing the discriminatory membership policy of the club, and thus there was no fourteenth amendment violation. *Id.* at 175, 92 S.Ct. at 1972. In another aspect of the case, the Court enjoined enforcement of a state rule which affirmatively required the Lodge to comply with its own racially discriminatory constitution and bylaws. "State enforcement of this rule, either judicially or administratively, would, under the circumstances, amount to a governmental decision to adopt a racially discriminatory policy." *Lugar, supra,* 457 U.S. at 938 n. 20, 102 S.Ct. at 2754 n. 20.

*Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) involved a private nursing home which cared for medicaid patients. The state licensed and regulated the facility and paid the expenses of more than 90 percent of the home's patients. The Court concluded that the decision of the nursing home to discharge or transfer medicaid patients without notice or an opportunity for a hearing did not constitute state action because the state was not involved in making those decisions. In the course

of its opinion, the Court delineated the reach of the state action doctrine. It said, in part, that a sufficiently close nexus between the State and the challenged action of the private organization must be established so that the action of the latter may fairly be treated as that of the state itself. *Id.* at 1004, 102 S.Ct. at 2785. The purpose of this requirement, the Court said, "is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct [of the private party] of which the plaintiff complains." *Id.* (emphasis in original). In this regard, the Court said that "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.* Explaining further, the Court said that "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Id.* at 1004–05, 102 S.Ct. at 2786.

*Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) involved a private school's decision to discharge a number of its teachers. The school was extensively regulated by and received most of its funds from the state. The Court held that "the school's receipt of public funds does not make the discharge decisions acts of the State." 457 U.S. at 840, 102 S.Ct. at 2771.[15]

 While we think the state action doctrine is generally applicable to claims of unconstitutional sex discrimination under the E.R.A., the doctrine plainly has no application in the circumstances of this case. The State did not initiate Burning Tree's single sex membership policy; it existed

---

**15.** The Attorney General of Maryland, in 65 Op.Att'y Gen. 103 (1980), found no state action in violation of the E.R.A. in the enactment of a statute providing funds to a private women's college which discriminated against men. Three years later, in 68 Op.Att'y Gen. 164 (1983), the Attorney General reached a different conclusion as to the tax deferral granted Burning Tree in the matter now before us.

long before enactment of § 19(e)(4). Nor was Burning Tree's decision to discriminate against women caused by the State. Neither is the State responsible for Burning Tree's membership policy; that policy did not result from the State's exercise of any coercive power over the club's activities. Conversely, the tax benefit available under the statute did not cause Burning Tree's discrimination against women. The purpose of the statute, *i.e.*, to preserve open spaces, has no relation to sex discrimination. As we see it, nothing in § 19(e)(4) encourages or discourages Burning Tree from changing its membership policy. The club would not lose its tax benefit if it decided to admit women; it would then be evaluated as a mixed membership club eligible for the tax benefit without regard to the primary purpose provision. Not only is the State not significantly involved in Burning Tree's membership policy, it is not involved at all. At worst, the State, by acquiescence, is indifferent to Burning Tree's policy of excluding women from membership. We thus conclude that Burning Tree is not a "state actor" within the contemplation of the state action doctrine. In so concluding, it is manifest that we do not share the lower court's view that the Attorney General, acting under the statute, encouraged and enforced Burning Tree's discriminatory membership policy. As we observed in *State v. Burning Tree Club*, 301 Md. 9, 25, 481 A.2d 785 (1984), the Attorney General's role under the statute is limited to a determination of whether a club's facilities are operated with the primary purpose of serving or benefiting members of a particular sex. We there said that the Attorney General "merely is a factfinder ... [and] does not administer the statute." 301 Md. at 25, 481 A.2d 785.

As a general proposition, discrimination by a private organization which may receive some government benefit does not violate the fourteenth amendment. *See Moose Lodge, supra*, 407 U.S. at 173, 92 S.Ct. at 1971. No case holds under circumstances like those here involved that the mere grant of a tax benefit to a private party with discriminatory membership policies, without more, transforms the

private club into a state entity, or compels a finding that the state encourages or supports the club's discriminatory policy. *See Bob Jones University v. United States,* 461 U.S. 574, n. 24, 103 S.Ct. 2017, n. 24, 76 L.Ed.2d 157 (1983).[16]

*Norwood v. Harrison, supra,* upon which appellees rely, is readily distinguishable from the case now before us. The statute under review in *Norwood* required the state of Mississippi to provide free textbooks to students in private as well as public schools. Many of the private schools in that state discriminated on the basis of race in their admission policies. The Supreme Court held, in light of the constitutional considerations underlying *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) that the state's aid to the students enrolled in racially discriminatory private schools violated the Fourteenth Amendment.

The case before us raises no Fourteenth Amendment claims and *Norwood* is therefore not controlling authority. Even if the Fourteenth Amendment was implicated in this case, however, *Norwood* would not be directly applicable, since the Supreme Court applies a more lenient standard of review to sex discrimination cases than to race discrimination cases. *Compare Lehr v. Robertson,* 463 U.S. 248, 264–67, 103 S.Ct. 2985, 2995–96, 77 L.Ed.2d 614 (1983) (to withstand scrutiny under the Fourteenth Amendment, state action "may not subject men and women to disparate treatment when there is no substantial relation between the disparity and an important state purpose"); *with Palmore v. Sidoti,* 466 U.S. 429, ——, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984) (to withstand scrutiny under the Fourteenth Amendment, state action that entails a classification

---

**16.** We note that Code, Art. 81, § 9(e) exempts from taxation qualifying property used and owned by "any nonprofit . . . fraternal or sororal, benevolent, educational, or literary institutions or organizations, including . . . nonpolitical, nonstock men's or women's clubs." Section 9(c) dealing with church related educational institutions and § 9(e) involving other private schools appear to authorize property tax exemptions for single-sex schools.

on the basis of race "must be justified by a compelling governmental interest and must be 'necessary ... to the accomplishment' of its legitimate purpose"). Moreover, the Supreme Court's analysis in *Norwood* is inapplicable to cases that arise under the Maryland E.R.A. As our cases clearly demonstrate, state action does not violate the E.R.A. unless it has the effect of abridging or denying "equality of rights under the law" on the basis of sex. *See, e.g., Turner, supra,* 299 Md. at 574, 474 A.2d 1297; *Condore, supra,* 289 Md. at 527–30, 425 A.2d 1011; *Kline, supra,* 287 Md. at 592–93, 414 A.2d 929; *Rand, supra,* 280 Md. at 516, 374 A.2d 900. In contrast, *Norwood* indicated that the Fourteenth Amendment "does not permit the State to aid discrimination even when there is no precise causal relationship between state financial aid to a [racially discriminatory] private school and the continued well-being of that school." 413 U.S. at 465–66, 93 S.Ct. at 2810–11. Thus, although a causal connection between the state action and the discrimination is required under the Maryland E.R.A., it was not required under *Norwood's* analysis of the Fourteenth Amendment. We therefore find *Norwood* inapposite to the present case.

The mere fact that Burning Tree is the only club presently qualifying under the primary purpose provision does not of itself change a sex-neutral statute into a nefarious state sponsored scheme to invidiously discriminate against women solely on account of their sex. Needless to say, § 19(e)(4) did not cause there to be no all-female country clubs (if such is the fact). *Compare Personnel Administrator v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), a case challenging a state veteran preference statute on the ground that its effects upon women were disproportionately adverse from that of men and, therefore, constituted discrimination in violation of the equal protection clause of the fourteenth amendment. Because the law provided equal treatment to all veterans, whether men or women, the Court said that the mere fact that the vast majority of veterans were men did not render unconstitu-

tional the gender-neutral preference. And *see Reyes v. Prince George's County,* 281 Md. 279, 380 A.2d 12 (1977), involving a claim that a statute constituted a special law violative of the Maryland Constitution because it provided funds for sports arenas within a designated county where, at the time of the enactment, there was but one beneficiary. We there found no constitutional violation because the law applied to all sports arenas in the county generally, making eligible for such funds any additional arenas that might be constructed in the future.

## VIII

We need not here give detailed consideration to whether state action in providing "separate but equal" facilities for men and women violates the E.R.A. Conceivably, a law requiring separation of the sexes might be subject to challenge on the ground that unconstitutional sex discrimination resulted therefrom because of inherent inequality of treatment for one sex or the other in the separation process itself. *See* 80 Yale L.J., *supra,* at 902–03. Of course, § 19(e)(4) does not require separate but equal country clubs for men and women but simply recognizes that there may be single sex clubs eligible to participate in the State's open space program.[17]

---

17. We note that Code, Art. 49B, § 7 authorizes the State to provide separate but equal facilities for men and women in state owned or operated public institutions.

We note further that *Darrin v. Gould,* 85 Wash.2d 859, 540 P.2d 882 (1975) suggests that separate but equal athletic teams in public schools for males and females would not violate that state's E.R.A. *Petrie v. Illinois High Sch. Ass'n,* 75 Ill.App.3d 980, 31 Ill.Dec. 653, 394 N.E.2d 855, 864 (1979) appears to be to the same effect.

The maintenance of all-male and all-female public schools has been held not to violate the fourteenth amendment. *See Vorchheimer v. School District of Philadelphia,* 532 F.2d 880 (3rd Cir.1976), *aff'd,* 430 U.S. 703, 97 S.Ct. 1671, 51 L.Ed.2d 750 (1977). Similarly, it has been held that separate school athletic programs for boys and girls do not violate the fourteenth amendment. For cases so holding, *see Yellow Springs, Etc. v. Ohio High Sch. Ath. Ass'n,* 647 F.2d 651, 657 (6th Cir.1981); *O'Connor v. Bd. of Ed. of School Dist. No. 23,* 645 F.2d 578, 581 (7th Cir.1981), *cert. denied,* 454 U.S. 1084, 102 S.Ct. 641, 70

## IX

A majority of the judges of the Court do not fully share the analysis set forth in this opinion and hold that the primary purpose provision is unconstitutional under the E.R.A. for the various reasons set forth in the concurring and dissenting opinions. It therefore becomes necessary to address Burning Tree's argument that, if the primary purpose provision enacted by Ch. 870 of the Acts of 1974 is unconstitutional, that provision cannot be severed from the prohibition against sex discrimination which was also enacted as part of Ch. 870.

Because appellees' complaint challenged only the primary purpose provision and because the circuit court's declaration of invalidity was limited to that provision, we accordingly limited our analysis of the E.R.A. issue. The severability issue, however, presents a question of legislative intent. In that context we must examine all of Ch. 870, including all of the Senate Amendment. In addition to inserting the primary purpose provision into H.B. 620 (see part I hereof), the Senate Amendment also provided that the prohibition against sex discrimination proposed by H.B. 620 would not apply "to the clubs which exclude certain sexes only on certain days and at certain times." We shall call this provision the "periodic discrimination" provision.

Viewed as a prohibition against sex discrimination Ch. 870 affects, as a theoretical matter, only a narrow range of country club activity and affects, as a practical matter, an even more narrow range of activity. Under the primary purpose provision a country club participating in the open

---

L.Ed.2d 619 (1981); *O'Connor v. Board of Educ. of School Dist. 23,* 545 F.Supp. 376, n. 7 at 381–82 (N.D.Ill.1982); *Lafler v. Athletic Bd. of Control,* 536 F.Supp. 104, 106 (W.D.Mich.1982); *Hoover v. Meiklejohn,* 430 F.Supp. 164, 170 (D.Col.1977); *Ritacco v. Norwin School District,* 361 F.Supp. 930, 932 (W.D.Pa.1973); *Mich. Dept. of Civ. Rights v. Waterford Tp.,* 124 Mich.App. 314, 335 N.W.2d 204, 208 (1983). *See also Leffel v. Wisconsin Interscholastic Athletic Ass'n,* 444 F.Supp. 1117, 1121 (E.D.Wis.1978); *Bucha v. Illinois High School Ass'n,* 351 F.Supp. 69, 74–75 (N.D.Ill.1972).

space program may exclude a person from membership solely because of that person's sex. Under the periodic discrimination provision a country club contracting to maintain open space may exclude members, based on their sex, from using some or all of the club facilities so long as the exclusion operates "only on certain days and at certain times." [18] Theoretically, Ch. 870 prevents a country club from having different initiation and/or membership fees based on sex. Practically, however, if a club wished to deter members of one sex from applying by setting higher charges for that sex, the objective could more effectively be obtained through a total exclusion of members of that sex in reliance on the primary purpose provision. As a prohibition against sex discrimination the net effect of Ch. 870 seems to be to prohibit a country club from *continuously* excluding, based on sex, members or their guests from using some part, but less than all, of the club's facilities or services.[19] An example of a facility falling within Ch. 870's prohibition would be a bar serving exclusively one sex at all times.

■ The invalidity of the primary purpose provision has no effect on Ch. 870's prohibitions against discrimination based on race, color, creed, or national origin. Nor does the invalidity of the primary purpose provision have any effect on the legislative scheme for bringing about compliance with those four prohibitions. The question in this phase of the case is whether the prohibition against sex discrimination can stand without the primary purpose provision and qualified only by the unchallenged periodic discrimination

18. While an objective of the periodic discrimination provision may have been to reserve certain days and times during which only women could use the golf course at a mixed membership country club, the language of the provision is not restricted to that specific application.

19. Appellees expressly disclaim that the E.R.A. prohibits separation on the basis of sex facilities of a "uniquely private and personal nature."

provision. The Court concludes that the sex prohibition cannot so stand.

There is no presumption in favor of severability where the invalid portion of a statute is an exception to a prohibition. In *State v. Schuller*, 280 Md. 305, 372 A.2d 1076 (1977), this Court considered a statute which banned residential picketing, unless a labor dispute was involved. Because of the exception the statute was held to violate equal protection, but the invalid exception was not severable on the following rationale.

A long established principle of statutory construction in determining severability questions, is that where the Legislature enacts a prohibition with an excepted class, and a court finds that the classification is constitutionally infirm, the court will ordinarily not presume that the Legislature would have enacted the prohibition without the exception, thereby extending the prohibition to a class of persons whom the Legislature clearly intended should not be reached. [*Id.* at 319, 372 A.2d at 1083.]

*See Turner v. State, supra; Wheeler v. State*, 281 Md. 593, 380 A.2d 1052 (1977). Here, severing the primary purpose provision would make the prohibition against sex discrimination operate as to single-sex country clubs and thereby enlarge that prohibition beyond its reach as enacted.

Ultimately the issue involves ascertaining what would have been the intent of the Legislature had the partial invalidity been known.[20] *See Turner v. State, supra,* 299

---

**20.** The 1974 Journals of the House of Delegates and Senate cast only minimal light on the problem. House Bill 620 in the form in which it was introduced passed the House on March 12 by a vote of 83 to 34. House J. at 1704. That same day the Bill was read the first time in the Senate and referred to the Committee on Finance. Senate J. at 1185. The Bill was favorably reported by the Finance Committee on April 3, but on motion of the sponsor of the Senate Amendment it was made a Special Order for April 4. Senate J. at 2590. On April 4 the Senate Amendment was offered from the floor and adopted. The amended Bill passed the Senate on third reading that same day by a vote of 30 to 2 and the Bill was returned to the House. Senate J. at 2779. The House concurred in the Senate Amendment on April 6 by a vote of 83

Md. at 576, 474 A.2d at 1302. This Court has said that if the dominant purpose of the statute may be carried out, it will sever the invalid portion. *See Davis v. State,* 294 Md. 370, 451 A.2d 107 (1982); *Cities Service Company v. Governor,* 290 Md. 553, 431 A.2d 663 (1981). It is clear from a comparison of Ch. 870 as enacted to the H.B. 620 as introduced that the dominant purpose of the "prohibition" against sex discrimination in the bill as enacted was to avoid, as much as possible, disturbing existing, sexually discriminatory practices of country clubs without completely deleting sex as one of the bases of prohibited discrimination. From the standpoint of sex discrimination Ch. 870 is nearly a complete, intrinsic contradiction. It confers a benefit on the one hand and then takes it away almost entirely on the other. It says that sex discrimination by country clubs is prohibited and at the same time says that sex discrimination is not prohibited when practiced by any club whose facilities are operated with the primary purpose of serving members of a particular sex. The primary purpose provision eliminates the most significant part of the ostensible prohibition and permits the opportunity for membership to be denied solely on the basis of sex. To make the ostensible prohibition against sex discrimination even more ineffective, a country club which has members of both sexes may discriminate, solely on the basis of sex, "on certain days and at certain times."

Under these circumstances we cannot say that the dominant purpose of the General Assembly was to enact a bar against sex discrimination which was to operate absent the primary purpose provision. As proposed, H.B. 620 would have completely barred sex discrimination. The Senate Amendment rendered the prohibition almost toothless. The House concurred in the extraction. To restore a full set of teeth to the prohibition would attribute to the General Assembly an intent which is belied by its actions. The

---

to 11. House J. at 4495. The last day of the 1974 legislative session was Monday, April 8.

invalid primary purpose provision is not severable from the prohibition against sex discrimination so that the latter also falls, together with the then completely superfluous periodic discrimination provision.

## X

The result of the several opinions in this Court is to affirm the judgment entered by the Circuit Court for Montgomery County declaring that the " 'primary purpose' provision of Article 81, Section 19(e)(4) of the Maryland Code violates Article 46 of the Maryland Declaration of Rights and is null and void."

The result of the concurrence of a majority of the judges of this Court in part IX of this opinion which holds that the primary purpose provision is not severable from the sex discrimination prohibition enacted by Ch. 870 of the Acts of 1974 is to reverse the injunction issued by the Circuit Court for Montgomery County against "the State of Maryland and the Maryland State Department of Assessments and Taxation."

In view of its holding that the primary purpose provision was invalid but was severable from the balance of Ch. 870 the circuit court did not reach appellees' contentions that the primary purpose provision violated Arts. 15 and 24 of the Maryland Declaration of Rights. We express no opinion on the merits of those contentions. Even if we were to assume that the contentions were meritorious, they would not support the issuance of the injunctions entered in the circuit court because the primary purpose provision is not severable from the sex discrimination prohibition.

JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED AS TO THE DECLARATORY JUDGMENT AND REVERSED AS TO THE INJUNCTIVE RELIEF. COSTS TO BE EVENLY DIVIDED BETWEEN APPELLANT AND APPELLEES.

RODOWSKY, J., concurs in the judgment.

ELDRIDGE, COLE and BLOOM, JJ., concur in part and dissent in part.

RODOWSKY, Judge, concurring.

■ I join in the analysis presented by the opinion announcing judgment insofar as certain arguments of the appellees are concerned. That opinion answers the contention that Burning Tree's participation in the open space program results in state action. For the reasons set forth therein, the roles of the Attorney General and of the State Department of Assessments and Taxation under Art. 81, § 19(e) together with what appellees' brief calls "a State-established and enforced disincentive to easing discriminatory barriers" do not result in "[e]quality of rights under the law" being "abridged or denied because of sex."

■ I write separately because the lead opinion has not identified, and responded directly to, appellees' argument that "the primary purpose provision by its terms singles out for special exception from an otherwise uniformly applicable anti-discrimination measure private discrimination of a certain type—sex—and to a certain degree—total—which neither the State nor a private club receiving a tax exemption could otherwise practice." [Footnote omitted]. With respect to this argument I believe that a portion of Ch. 870 of the Acts of 1974 is facially unconstitutional under the E.R.A. but that the unconstitutional portion is clearly non-severable. I therefore join in the Court's mandate.

The E.R.A. is not self-executing as to memberships in private country clubs. Had § 19(e)(4) been amended in 1974 to prohibit discrimination based only on race, color, creed, or national origin by country clubs participating in the open space program, the amendment would have been, in my opinion, valid under the E.R.A. The E.R.A. does not compel the General Assembly to legislate to prohibit discrimination based on sex in any particular aspect of the private sector of society. For example, when Art. 46 of the Maryland

Declaration of Rights, the E.R.A., was ratified on November 7, 1972, the Maryland public accommodations law prohibited discrimination based upon race, creed, color, or national origin. *See* Md.Code (1957, 1972 Repl.Vol.), Art. 49B, § 11. By Ch. 684 of the Acts of 1978 the public accommodations law was amended to prohibit, in addition, discrimination based on sex and age. The omission of sex discrimination from the prohibitions of the public accommodations law did not render that statute unconstitutional in the period between November 7, 1972, and July 1, 1978.

■ In the case now before us, however, the General Assembly has included in Ch. 870 a prohibition against discrimination based on sex. That legislation is state action. Obviously the equality "under law" which the E.R.A. guarantees embraces an enactment by the General Assembly. Further, "[t]his Court has consistently held that a law that imposes different benefits and different burdens upon persons based solely upon their sex violates the Maryland ERA." *Turner v. State*, 299 Md. 565, 574, 474 A.2d 1297, 1301 (1984). In order to test whether unconstitutionally discriminatory state action is found in the statute itself, I shall reframe appellees' argument in terms of disparate benefits.

Under Ch. 870 a person applying for membership in a participating country club who is denied membership because of the person's race, color, creed, or national origin enjoys the benefit of a legal procedure under which the Attorney General will seek voluntary compliance by the club or issue a cease and desist order, the violation of which results in loss to the country club of its favorable tax treatment. On the other hand, under Ch. 870 which purports to prohibit discrimination based on sex, a person applying for membership in a participating country club who is refused membership based solely on the applicant's sex has no legal benefits whatsoever. Under Ch. 870 a member of a participating, mixed membership country club who is discriminated against on the basis of race, color,

creed, or national origin on certain days and at certain times enjoys the benefits described above. Under Ch. 870 a member of a participating, mixed membership country club who, solely on the basis of sex, is discriminated against on certain days and at certain times, has no benefits. It is only with respect to discrimination falling outside of the ambits of the primary purpose provision and of the periodic discrimination provision that members of a participating country club who are discriminated against on the basis of race, color, creed, or national origin and members who are discriminated against on the basis of sex enjoy equal benefits under Ch. 870.

This analysis highlights that, on this aspect of appellees' argument, the word "sex" appears to be used generically in the statute. It is used to apply to either the male sex or the female sex. But, in application, the provision will always be applied to a particular sex, the one excluded by a given, participating country club. In all of the cases previously decided by this Court in which a rule of common law or a statute was invalidated under the E.R.A. the rule or statute itself isolated one sex and specified either males or females for different burdens or benefits. It is probably only in an antidiscrimination statute which prohibits both sex and other forms of discrimination that the different treatment of sex discrimination from other forms of discrimination can even raise the problem under consideration, because, in the context of sex discrimination, only one sex will be the object of discrimination.

It is not an answer to the subject argument of the appellees to say that at the elevated level of the statewide open space program established by § 19(e) the program is neutral with respect to sex, in the sense that an all female or an all male country club is eligible to participate. The ostensible prohibition against sex discrimination applies to each individual country club participating in the open space program. The universe of consideration for the particular problem created by this antidiscrimination law is any participating country club, in and of itself.

The E.R.A. has elevated to the constitutional level a policy against discrimination based on a person's sex to the extent that "[e]quality of rights under the law shall not be abridged or denied because of sex." In my opinion, once the General Assembly decides to address sex-based discrimination in an antidiscrimination statute which also prohibits discrimination on other bases, the E.R.A., in light of its underlying policy, prevents the General Assembly from conferring lesser benefits on persons who are objects of sex-based discrimination.

I believe the Senate Amendment has produced a unique creature—an unconstitutionally discriminatory antidiscrimination law. Nevertheless, for the reasons given in part IX of the opinion announcing judgment, I agree that the primary purpose provision is not severable from the prohibition against sex discrimination.

ELDRIDGE, Judge, concurring and dissenting:

I concur in the judgment of the Court insofar as it affirms the trial court's declaration that the "primary purpose" provision of Art. 81, § 19(e)(4), violates the Equal Rights Amendment to the Maryland Constitution. I dissent from the remainder of the Court's judgment.

The principal purpose of this opinion is to respond to the positions taken in Parts VI–IX of Chief Judge Murphy's opinion announcing the judgment of the Court, even though that opinion is not an opinion of the Court. If the views set forth in Parts VI–VIII of Chief Judge Murphy's opinion were in the future to be adopted by a majority of this Court, the effectiveness of the Equal Rights Amendment to the Maryland Constitution would be substantially impaired.

Since 1965, Art. 81, § 19(e) of the Maryland Code has provided for preferential tax assessments to country clubs which agree to preserve open spaces by not selling or developing their lands. By Ch. 870 of the Acts of 1974, the General Assembly added to § 19(e) a broad anti-discrimina-

tion requirement, with an extensive enforcement scheme, as follows:

"In order to qualify under this section, the club shall not practice or allow to be practiced any form of discrimination in granting membership or guest privileges based upon the race, color, creed, sex, or national origin of any person or persons. The determination as to whether or not any club practices discrimination shall be made by the office of the Attorney General after affording a hearing to the club.... If the Attorney General determines that a pattern of discrimination is evident in any club, he shall negotiate a consent agreement with that club to cease such discrimination. If that club breaches or violates the consent agreement or refuses to enter a consent agreement, then the Attorney General shall issue a cease and desist order to that club. If the club breaches or violates the terms of the cease and desist order, the tax exemption, tax credit or beneficial assessment shall be withdrawn, until such time that the Attorney General determines that the club is in compliance with this subsection. Further, any club which fails to qualify as a country club, under paragraph (4) of this subsection because the club has engaged in discrimination shall not be liable for unpaid taxes provided for in subparagraph (7) of this subsection. However the club shall be assessed and taxed without regard to this subsection. There shall be a right of appeal as provided by sections 255 and 256 of Article 41 of this Code."

In the bill which became Ch. 870, immediately prior to its final passage, an amendment was adopted which added, after the first two sentences quoted above, the following language (generally referred to as the "primary purpose" provision):

"The provisions of this section with respect to discrimination in sex shall not apply to any club whose facilities are operated with the primary purpose, as determined by the

Attorney General, to serve or benefit members of a particular sex...." [1]

The argument in the present case over whether this primary purpose provision violates the Maryland Equal Rights Amendment (E.R.A.),[2] and whether Burning Tree may continue to discriminate against women and still receive the tax preference, has essentially focused upon three issues:

1. Whether there is state action; [3]

2. If there is state action, whether the primary purpose provision constitutes an abridgement of equality of rights because of sex;

3. If the primary purpose provision does violate the E.R.A., whether that provision is severable from the broad prohibition of discrimination, or the prohibition of discrimination because of sex, contained in the remainder of Ch. 870 of the Acts of 1974.

With regard to these issues, Chief Judge Murphy's opinion in Part VI appears to acknowledge that the enactment of Ch. 870 of the Acts of 1974 and its administration by state officials constitute "state action." Nevertheless, the opinion seems to take the position that the primary purpose

---

**1.** Following the quoted language, the amendment also added the words "nor to the clubs which exclude certain sexes only on certain days and at certain times." This clause, referred to in Judge Murphy's opinion as the "periodic discrimination provision," was not specifically dealt with in the trial court's judgment. Consequently, I shall express no view concerning the clause.

**2.** Article 46 of the Maryland Declaration of Rights.

**3.** The parties, the other opinions in this case, and decisions under other state constitutional E.R.A. provisions, equate the "under the law" provision in the E.R.A. with the "state action" doctrine under the Fourteenth Amendment. I agree that the two concepts are essentially the same. *Cf., Rendell-Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2769–2770, 73 L.Ed.2d 418 (1982); *United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966) (stating that the "under color of law" language in 42 U.S.C. § 1983 means "the same thing as the 'state action' required under the Fourteenth Amendment.").

provision of Ch. 870 facially comports with the E.R.A. because "it does not apportion or distribute benefits or burdens unequally among the sexes" and makes the statutory "benefit equally available to all single sex country clubs agreeing to participate in the State's open space program." By treating Ch. 870 on its face as "gender neutral" and not violative of the E.R.A., Part VI of Chief Judge Murphy's opinion seems to embrace a type of "separate but equal" doctrine for purposes of the E.R.A.[4]

Viewing the Maryland statute as one which simply provides financial aid to country clubs generally if the clubs agree to preserve open spaces, Chief Judge Murphy in Part VII of his opinion states that the governmental involvement in Burning Tree's discrimination is not sufficient to constitute state action.

Because a majority of the Court rejects Chief Judge Murphy's views and holds that the primary purpose provision does constitute state action violative of the E.R.A., a different majority decides in Part IX of Judge Murphy's opinion that the primary purpose provision is not severable from the remainder of Ch. 870 of the Acts of 1974.[5]

In my opinion, there clearly is state action here. Moreover, I conclude that the E.R.A. prohibits the application of the primary purpose provision to Burning Tree. Finally, I believe that the primary purpose clause is severable from the other provisions in Ch. 870 of the Acts of 1974.

(1)

█ I totally disagree with the view that Ch. 870 of the Acts of 1974, and its administration by the State are "gen-

---

4. The opinion tempers this slightly in Part VIII, saying that *"[c]onceivably* a law *requiring* separation of the sexes *might* be subject to challenge on the ground [of] unconstitutional sex discrimination," but that the Maryland statute is valid because it *"simply recognizes"* that single sex clubs may participate in the state program. (Emphasis added).

5. In effect, the Court's entire mandate in this case reflects the conclusions of only one member, Judge Rodowsky.

der neutral" and do not sufficiently involve the State in discrimination so as to constitute "state action."

Art. 81, § 19(e), as originally enacted by Ch. 399 of the Acts of 1965, was, as Chief Judge Murphy's opinion describes in Part VI, concerned with affording a tax benefit to private country clubs which agree to preserve open spaces in the public interest, was designed to benefit Maryland citizens of both sexes by preserving open spaces, and facially did not relate to gender, race, or any other suspect classification. The constitutional attack in this case, however, is not upon Ch. 399 of the Acts of 1965.

Ch. 870 of the Acts of 1974, on the other hand, is a statute relating entirely to discrimination on the basis of "race, color, creed, *sex*, or national origin." (Emphasis added). This is the sole subject matter of the 1974 enactment. The primary purpose provision of Ch. 870 was concerned only with sex discrimination. Ch. 870 flatly prohibits a club from discriminating on the basis of race, color, creed or national origin and continuing to receive the tax benefits of § 19(e). It also prohibits sex discrimination except when the sex discrimination is essentially total. Thus, the statute draws an express distinction between race, color, creed and national origin discriminations on the one hand, and sex discrimination on the other hand. It also expressly distinguishes between two types of sex discrimination, allowing sex discrimination when it is the "primary purpose" of the club and disallowing it in other situations. The provisions in Ch. 870 relating to administration by the State likewise concern only discrimination.

Ch. 870 of the Acts of 1974, therefore, is not simply the "neutral" grant-in-aid statute described in Parts VI and VII of Chief Judge Murphy's opinion. Rather, it is a statute specifically relating to discrimination and, with regard to sex, sanctioned and prohibited sex discrimination, with a statutorily created enforcement machinery. Consequently, Ch. 870 on its face expressly draws classifications which implicate the E.R.A. Moreover, both the statute and the

administrative machinery created by it clearly involve the State in the discrimination by Burning Tree.

In finding an absence of state action, Chief Judge Murphy relies upon *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), and upon three Supreme Court cases holding that there was no state action for purposes of the Fourteenth Amendment. They are *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Rendell-Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); and *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). None of these cases support the Chief Judge's position.

The language from *Lugar* seized upon by Chief Judge Murphy is that action by a private party pursuant to statute, "without something more," is "not sufficient to justify a characterization of that party as a 'state actor.'" 457 U.S. at 939, 102 S.Ct. at 2754. In the instant case there is a great deal more. The statute itself draws classifications based on sex, expressly enabling a private party to continue discriminating while receiving a substantial state subsidy. This is done pursuant to a statutorily created state administrative proceeding, in which it is determined that the private party is engaged in statutorily sanctioned sex discrimination. These factors also distinguish the present case from *Blum v. Yaretsky*, *Rendell-Baker v. Kohn*, and *Moose Lodge No. 107 v. Irvis*.

In *Blum*, the challenged action was not sanctioned by a state statute or regulation, or in accordance with a classification set forth by statute, or done as a condition for receiving state aid, but was solely based on medical judgments of private parties. Similarly, in *Rendell-Baker* the challenged action had no relationship to the provisions of the state aid statute. The Court in *Moose Lodge* held that the mere regulation of the sale of alcoholic beverages in private establishments did not involve the state in the racial discrimination by those establishments. In that case, unlike the case at bar, the statutory and regulatory provisions

which were upheld made no classification relevant to the discrimination.

A case much closer in point is *Simkins v. Moses H. Cone Memorial Hospital,* 323 F.2d 959 (4th Cir.1963); *cert. denied,* 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964). That case involved a provision of the Hill-Burton Act, 42 U.S.C. § 291e(f), which is quite analogous to Ch. 870 of the Acts of 1974. The Hill-Burton Act authorized the payment of federal funds for private hospital construction and the promotion of hospital services. Section 291e(f) of that Act, like Maryland's Ch. 870 of the Acts of 1974, contained a clause broadly prohibiting discrimination on account of "race, creed, or color" by the private recipients of the governmental aid; otherwise the aid would not be given. Section 291e(f), again like Ch. 870, went on to provide an exception to the prohibition "in cases where separate hospital facilities are provided for separate population groups" and the services are "of like quality for each such group." Also somewhat like Ch. 870, the statute provided for administrative enforcement machinery involving both federal and state governments. *See* 323 F.2d at 961 n. 1 and n. 2, 963–965. In overturning the federal district court's holding of no governmental action, and in striking down the "separate but equal" provision of the Hill-Burton Act, the Fourth Circuit, in an opinion by Chief Judge Simon E. Sobeloff, pointed to the affirmative sanctioning of the challenged discrimination by federal and state governments (*id.* at 968) and the "overt state and federal approval . . . [of] otherwise purely private discrimination" (*id.* at 969). The court stated (*id.* at 968):

> "It is settled that governmental sanction need not reach the level of compulsion to clothe what is otherwise private discrimination with 'state action.' "

The *Simkins* case directly supports the position that state action is present in the case at bar. *See also, Evans v. Newton,* 382 U.S. 296, 302, 305–306, 86 S.Ct. 486, 490, 491–492, 15 L.Ed.2d 373, 379 (1966) (concurring opinion of Justice White).

(2)

■ The primary purpose provision on its face, and its administration by state officials, cannot be reconciled with the constitutional principles set forth in this Court's prior opinions.

In the present case, three judges seem to take the position that the E.R.A. is implicated only when a statute, common law provision or other government action imposes a burden on one sex but not the other, or confers a benefit upon one sex but not the other. Moreover, the three apparently do not view the express sanctioning of single sex clubs as imposing a burden upon the excluded sex, as long as the governmental action in theory equally sanctions discrimination by single sex facilities against persons of the other sex.

While it is true that many of our prior cases have involved government action directly imposing a burden or conferring a benefit entirely upon either males or females, we have never held that the E.R.A. is narrowly limited to such situations. On the contrary, we have viewed the E.R.A. more broadly, in accordance with its language and purpose.

Thus, in *Md. St. Bd. of Barber Ex. v. Kuhn*, 270 Md. 496, 506–507, 312 A.2d 216 (1973), this Court took the position that, under the E.R.A., classifications based on sex were " 'suspect classifications' " subject to " 'stricter scrutiny.' " Later, in *Rand v. Rand*, 280 Md. 508, 512, 374 A.2d 900 (1977), Chief Judge Murphy for the Court stated that the language of the E.R.A. is "unambiguous" and that

"[t]his language mandating equality of rights can only mean that *sex is not a factor.*" (Emphasis added)."

The Court in *Rand* then turned to the opinion of the Supreme Court of Washington in *Darrin v. Gould*, 85 Wash.2d 859, 540 P.2d 882 (1975), saying of that case (280 Md. at 512, 374 A.2d 900):

"The court there said that by ratifying 'the broad, sweeping, mandatory language' of the amendment, the citizens 'intended to do more than repeat what was already con-

tained in the otherwise governing constitutional provisions, federal and state, by which discrimination based on sex was permissible under the rational relationship and strict scrutiny tests.' 85 Wash.2d at 871, 540 P.2d at 889. The court, therefore, did not consider whether the sex-based classification at issue—concerning eligibility to participate in high school sports—satisfied the rational relationship or strict scrutiny test. It found that the 'overriding compelling state interest' had been determined by the people of the state to be that 'Equality of rights and responsibility under the law shall not be denied or abridged on account of sex.' "

The *Rand* opinion went on to discuss E.R.A. cases in other jurisdictions, concluding (280 Md. at 515–516, 374 A.2d 900):

"It is thus clear that the tests employed under constitutional provisions dealing with equality of rights range from absolute to permissive. Like the Supreme Court of Washington, however, we believe that the 'broad sweeping, mandatory language' of the amendment is cogent evidence that the people of Maryland are fully committed to equal rights for men and women. The adoption of the E.R.A. in this state was intended to, and did, drastically alter traditional views of the validity of *sex-based classifications*." (Emphasis added).

The principles enunciated in *Rand* have been reiterated in subsequent opinions of this Court. *See, e.g., Condore v. Prince George's Co.*, 289 Md. 516, 524, 425 A.2d 1011 (1981) (the E.R.A. " 'can only mean that sex is not a factor' "); *Kline v. Ansell*, 287 Md. 585, 591–592, 414 A.2d 929 (1980).

Cases under E.R.A. provisions in other state constitutions are generally to the same effect, holding that *classifications* based on sex are suspect, that they are subject to at least strict scrutiny, and that the burden is upon those attempting to justify such classifications to demonstrate a compelling state interest. For example, the Supreme Judicial Court of Massachusetts stated in an opinion to that State's Legislature (*Opinion of the Justices*, 374 Mass. 836, 839–840, 371 N.E.2d 426 (1977)):

"We believe that the application of the strict scrutiny—compelling State interest test is required in assessing any governmental classification based solely on sex.... To use a standard in applying the Commonwealth's equal rights amendment which requires any less than the strict scrutiny test would negate the purpose of the equal rights amendment and the intention of the people in adopting it."

The Massachusetts court also pointed out (374 Mass. at 838–839, 371 N.E.2d 426) that cases in some jurisdictions, namely Washington [6] and Pennsylvania,[7] could be read as imposing a stricter standard on sex classifications than the "strict scrutiny" test, and, in this connection, the court cited the discussion in this Court's *Rand* opinion. In a later case, the Massachusetts Court reiterated (*Attorney General v. Massachusetts Interscholastic Athletic Association, Inc.,* 378 Mass. 342, 354, 393 N.E.2d 284 (1979)):

"We have held under ERA that classifications on the basis of sex are subject to a degree of constitutional scrutiny 'at least as strict as the scrutiny required by the Fourteenth Amendment for racial classifications' (*Commonwealth v. King,* 374 Mass. 5, 21 [372 N.E.2d 196] [1977] ), and noted that such classifications are not permissible unless they meet two conditions: they must 'further a demonstrably compelling interest and limit their impact as narrowly as possible consistent with their legitimate purpose.' *Id.* at 28 [372 N.E.2d 196]."

The same view was taken by the Supreme Court of Illinois in *People v. Ellis,* 57 Ill.2d 127, 132–133, 311 N.E.2d 98 (1974). There, after reviewing United States Supreme Court equal protection cases dealing with sex classifications, the Illinois Court stated:

"In contrast to the Federal Constitution, which, thus far, does not contain the Equal Rights Amendment, the Con-

---

6. *Darrin v. Gould,* 85 Wash.2d 859, 871, 540 P.2d 882 (1975).

7. *Commonwealth v. Butler,* 458 Pa. 289, 296, 328 A.2d 851 (1974).

stitution of 1970 contains section 18 of article I, and in view of its explicit language, and the debates, we find inescapable the conclusion that it was intended to supplement and expand the guaranties of the equal protection provision of the Bill of Rights and requires us to hold that a classification based on sex is a 'suspect classification' which, to be held valid, must withstand 'strict judicial scrutiny.' "

*See also, e.g., People v. Barger,* 191 Colo. 152, 155, 550 P.2d 1281 (1976) ("legislative classifications predicated on sexual status must receive the closest judicial scrutiny").

Consequently, the E.R.A. renders sex-based *classifications* suspect and subject to at least strict scrutiny, with the burden of persuasion being upon those attempting to justify the classifications. In this respect, the E.R.A. makes sex classifications subject to at least the same scrutiny as racial classifications. Of course, because of the inherent differences between the sexes, some sex-based classifications may be justified after such scrutiny, whereas comparable race-based classifications could not be sustained. As the United States Supreme Court stated in *Goss v. Board of Education,* 373 U.S. 683, 687, 83 S.Ct. 1405, 1408, 10 L.Ed.2d 632 (1963), "racial classifications are 'obviously irrelevant and invidious.' " Thus, separate restroom or locker room facilities for blacks and whites cannot be tolerated, but such separate facilities for men and women can be justified by the State.[8]

Turning to Ch. 870 of the Acts of 1974, it is clear that the General Assembly has expressly made classifications using

---

8. In this connection, the question of whether single sex school facilities or athletic teams can be justified by the state, under equal rights amendments, has in recent years been the subject of much litigation and differing views. *Compare, e.g., Petrie v. Illinois High School Ass'n,* 75 Ill.App.3d 980, 31 Ill.Dec. 653, 394 N.E.2d 855 (1979); *Attorney General v. Massachusetts Interscholastic Athletic Association, Inc.,* 378 Mass. 342, 393 N.E.2d 284 (1979); *Opinion of the Justices,* 374 Mass. 836, 371 N.E.2d 426 (1977); *Newberg v. Board of Public Ed.,* 26 Pa.D. & C.3d 682, 9 Phila. 556 (Ct. of Common Pleas 1983); *Comm. By Israel*

sex as a factor. Preliminarily, the statute classifies types of discrimination, prohibiting without exception discrimination based on race, color, creed or national origin but permitting some forms of sex discrimination.[9] Thus, under the statute, a country club operated for the primary purpose of serving persons of a particular national origin is ineligible for the state subsidy, whereas a country club excluding women is eligible. This is particularly anomalous, considering that the only one of the listed discriminations expressly banned by the Maryland Constitution is sex discrimination.[10] The principal classification implicating the E.R.A. arises from the language authorizing clubs, totally segregated on the basis of sex, to maintain their discriminatory practices and, at the same time, to continue receiving a significant state benefit. On the other hand, sexually integrated country clubs are generally precluded from discriminating on the basis of sex. It is also noteworthy that the statute, by providing for contracts requiring that lands remain as open spaces, authorizes the acquisition of negative easements by the State. Consequently, under the statute and its implementation, the State is permitting land in which the State has a property right to be utilized by a segregated organization. *Cf., Burton v. Wilmington Pkg. Auth.*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Statom v. Bd. of Comm.*, 233 Md. 57, 195 A.2d 41 (1963).

Ch. 870 of the Acts of 1974, therefore, on its face draws classifications based on gender. In light of this, the statute is subject to strict scrutiny, and the burden of persuasion falls upon those seeking to justify the classifications. Nei-

---

*Packel, A.G. v. P.I.A.A.*, 18 Pa. Commw. 45, 334 A.2d 839 (1975); *Darrin v. Gould*, 85 Wash.2d 859, 540 P.2d 882 (1975).

**9.** *Cf., Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969).

**10.** Of course, the general due process and equal protection principles of Article 24 of the Declaration of Rights are applicable to the other forms of discrimination.

ther the State, nor a state agency, nor a state official has in this case defended the statute. Burning Tree has offered nothing in justification of the classifications made; instead, the thrust of its argument in the trial court and in this Court has been that the E.R.A. is not implicated or, in the alternative, that the primary purpose provision is not severable from the remainder of Ch. 870.[11] Moreover, unlike separate facilities obviously justified by the inherent differences between the sexes, this is not a situation where the Court can judicially notice justification for the sex-based classifications. Therefore, I can only conclude that the primary purpose provision of Ch. 870, on its face, violates the E.R.A.

(3)

Even when a statute is not facially discriminatory, or does not expressly draw or recognize a suspect classification, an inquiry into the actual facts, to determine the existence of a discriminatory purpose and impact, is appropriate. *See, e.g., Hunter v. Underwood,* —— U.S. ——, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985); *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 265–268, 97 S.Ct. 555, 563–565, 50 L.Ed.2d 450 (1977); *Griffin v. School Board,* 377 U.S. 218, 231–232, 84 S.Ct. 1226, 1233–1234, 12 L.Ed.2d 256 (1964); *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Hawkins v. Town of Shaw, Mississippi,* 437 F.2d 1286 (5th Cir.1971).

In 1974, and at all times since then, Burning Tree was the only entity to which the primary purpose provision was applicable. It is undisputed that the sole purpose of the provision was to allow Burning Tree to continue discriminating against women and still receive the state subsidy. This has also been the sole effect of the provision since 1974.

Chief Judge Murphy responds by stating that the statute "did not cause there to be no all-female country clubs...."

---

**11.** In the trial court, the case was decided on cross-motions for summary judgment. Nothing accompanying the motions related to any possible justification for the classifications drawn by the statute.

This, however, does not change the fact that the purpose and effect of the primary purpose provision was to permit one country club to maintain its discriminatory policy while continuing to receive a substantial state benefit. The Chief Judge's opinion also relies upon *Personnel Administrator v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). But in that case, the purpose of the challenged law was not to sanction the continuation of discrimination against women, and the sole beneficiaries were not men. Finally, Judge Murphy cites *Reyes v. Prince George's County*, 281 Md. 279, 380 A.2d 12 (1977), a case involving the special law provision of the Maryland Constitution.[12] That constitutional provision, however, had an entirely different history and purpose than the E.R.A.; it was not specifically designed to prohibit governmental action discriminating between individuals on the basis of generally irrelevant personal characteristics. As recognized in other E.R.A. cases, the constitutional provisions most analogous to the E.R.A. are those guaranteeing equal protection of the laws.

As previously indicated, the opinion announcing the Court's judgment has repeatedly confused the purpose and

---

**12.** Article III, § 33, of the Maryland Constitution provides as follows: "Section 33. Local and special laws.

The General Assembly shall not pass local, or special Laws, in any of the following enumerated cases, viz.,: For extending the time for the collection of taxes; granting divorces; changing the name of any person; providing for the sale of real estate, belonging to minors, or other persons laboring under legal disabilities, by executors, administrators, guardians or trustees; giving effect to informal, or invalid deeds or wills; refunding money paid into the State Treasury, or releasing persons from their debts, or obligations to the State, unless recommended by the Governor, or officers of the Treasury Department. And the General Assembly shall pass no special Law, for any case, for which provision has been made, by an existing General Law. The General Assembly, at its first Session after the adoption of this Constitution, shall pass General Laws, providing for the cases enumerated in this section, which are not already adequately provided for, and for all other cases, where a General Law can be made applicable.

effect of the 1965 statute with the purpose and effect of the 1974 primary purpose provision. For example, Chief Judge Murphy's opinion speaks of the burden of the statute being borne by all Maryland citizens. The opinion states that Marylanders of both sexes share the benefits of preserving open spaces, that the "purpose of the statute ... [is] to preserve open spaces," that the State is "not significantly involved in Burning Tree's membership policy," that "[a]t worst, the State ... is indifferent to Burning Tree's policy of excluding women ...," and that the "sex-neutral [Maryland] statute ... [is not] a nefarious state sponsored scheme to invidiously discriminate against women solely on account of their sex." All of this might or might not be true with regard to § 19(e) as originally enacted in 1965. The plaintiffs, however, are not challenging the original 1965 statute. They are challenging the 1974 primary purpose provision. And, to reiterate, the *only* purpose and effect of the 1974 primary purpose provision was to allow Burning Tree to continue discriminating against women and still receive a large state subsidy.

If the purpose and effect of the primary purpose provision had related to single race rather than single sex clubs, the provision, regardless of any alleged neutrality in the language, would clearly fall under the principles of *Hunter v. Underwood, supra; Arlington Heights v. Metropolitan Housing Corp., supra; Gomillion v. Lightfoot, supra,* and similar cases. Consequently, the provision is suspect under the E.R.A. and, absent strong justification by the State, violates the state constitutional prohibition against sex discrimination.[13]

(4)

Finally, I believe that the primary purpose provision is severable from the remainder of Ch. 870 of the Acts of 1974.

---

**13.** Because the issue was neither raised nor argued by the parties, this opinion does not address whether the tax exemption granted Burning Tree under the 1965 statute amounts to state action prohibited by the E.R.A.

The applicable principles regarding severability were recently summarized in *Davis v. State,* 294 Md. 370, 383–384, 451 A.2d 107 (1982), as follows:

"The primary focus in questions of severability is legislative intent. The intent to be ascertained, however, is not actual legislative intent, as the Legislature obviously intended to enact the statute as written in its entirety. 'Rather, when severability is the issue, the courts must look to what *would have been the intent* of the legislative body, if it had known that the statute could be only partially effective.' *Cities Service Co. v. Governor,* 290 Md. 553, 575, 431 A.2d 663 (1981), quoting from *O.C. Taxpayers v. Ocean City,* 280 Md. 585, 600, 375 A.2d 541 (1977). *See Anne Arundel County v. Moushabek,* 269 Md. 419, 428, 306 A.2d 517 (1973); *Sanza v. Md. Board of Censors,* 245 Md. 319, 338, 226 A.2d 317 (1967).

"In determining this legislative intent, courts apply certain established principles of construction. 'Perhaps the most important of these principles is the presumption even in the absence of an express clause or declaration, that a legislative body generally intends its enactments to be severed if possible.' *O.C. Taxpayers v. Ocean City, supra,* 280 Md. at 600 [375 A.2d 541]. 'It ... becomes the duty of the court whenever possible to separate the valid from the invalid provisions.' *Davidson v. Miller,* 276 Md. 54, 83, 344 A.2d 422 (1975). The presumption in favor of severability, and the duty to sever if at all possible, are reinforced if a severability clause is present. *O.C. Taxpayers v. Ocean City, supra,* 280 Md. at 601 [375 A.2d 541], and cases there cited. Moreover, since 1973, the Legislature has in effect provided that all statutes have a severability clause. Ch. 241 of the Acts of 1973. [Code (1957, 1981 Repl.Vol.), Art. 1, § 23].

"Of virtually equal importance is the rule that, when the dominant purpose of a statute may largely be carried out notwithstanding the invalid provision, courts will ordinarily sever the statute and enforce the valid portion. *Cities Service Co. v. Governor, supra,* 290 Md. at 576

[431 A.2d 663]; *O. C. Taxpayers v. Ocean City, supra,* 280 Md. at 601 [375 A.2d 541], and cases cited therein."

These principles certainly indicate that the primary purpose clause is severable. In reaching a contrary conclusion, the majority (as to this issue) fails to give any effect to the strong presumption in favor of severability, reinforced by Art. 1, § 23.

Moreover, I believe that the dominant purpose of Ch. 870 was the prohibition of various forms of discrimination, *including sex discrimination.* The dominant purpose was not the preservation of a subsidy for a single discriminatory country club.

In contending that the primary purpose provision is not severable, Burning Tree (as well as a majority of the Court's panel on this issue) relies upon the following principle of construction, as set forth in *State v. Schuller,* 280 Md. 305, 319, 372 A.2d 1076 (1977).

"A long established principle of statutory construction in determining severability questions, is that where the Legislature enacts a prohibition with an excepted class, and a court finds that the classification is constitutionally infirm, the court will ordinarily not presume that the Legislature would have enacted the prohibition without the exception, thereby extending the prohibition to a class of persons whom the Legislature clearly intended should not be reached."

This principle, however, has generally been applied where severance of the exception would impose a sanction or "substantial hardship on the otherwise excepted class." *O. C. Taxpayers v. Ocean City,* 280 Md. 585, 601, 375 A.2d 541 (1977), and cases there cited. As Burning Tree could retain the state subsidy simply by abandoning its discriminatory practices, severance of the exception imposes no substantial hardship on Burning Tree. Furthermore, the cases applying the *Schuller* principle have involved excepted classes containing a significant number of entities. It is

doubtful that the principle has much force when the excepted class consists of a single entity. Finally, the *Schuller* principle is not an inflexible rule, and courts have often severed invalid exceptions. *O.C. Taxpayers v. Ocean City, supra,* 280 Md. at 601, 375 A.2d 541, and cases there cited.

Burning Tree also relies upon the fact that a bill similar to Ch. 870, but without the primary purpose provision, was not enacted at the 1973 session of the General Assembly. This was House Bill 790 of the 1973 session. An examination of the legislative history, however, shows that the failure of House Bill 790, and the enactment of Ch. 870, cannot be attributed to the absence or presence of the primary purpose provision. House Bill 790 was not reported favorably by the House Ways and Means Committee until two weeks before the end of the 1973 session, and did not pass the House until the last week of the session. 1973 H. Journal 1948, 2262. The bill was not approved by the Senate Finance Committee until almost the end of the session, 1973 S. Journal 2810, and died in the last minute legislative logjam. No amendment to House Bill 790 containing a provision like the primary purpose clause was proposed from the floor. Consequently, the failure of House Bill 790 does not support Burning Tree's argument that the addition of the primary purpose clause to what became Ch. 870 was necessary for its passage.

Settled principles of statutory construction, therefore, should require a holding that the primary purpose clause is severable from the rest of Ch. 870.

For the above reasons, I would affirm the entire judgment of the circuit court.[14]

Judges COLE and BLOOM have authorized me to state that they concur with the views expressed in this opinion.

---

**14.** Burning Tree makes certain arguments having no relation to the E.R.A. In my opinion, they are totally lacking in merit and call for no discussion in this opinion.